### CHESAPEAKE & O. RY. CO. v. CHARLTON.*

(Circuit Court of Appeals, Fourth Circuit. November 9, 1917.)

No. 1554..

MASTER AND SERVANT ⬳111(1½)—SAFETY APPLIANCE ACT—COUPLING DEVICE.

It is a compliance with Safety Appliance Act March 2, 1893, c. 196, § 2, 27 Stat. 531 (Comp. St. 1916, § 8606), providing that on and after the 1st day of January, 1898, it shall be unlawful for common carriers to haul or permit to be hauled or used on their lines any cars used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars, for a railroad company to provide appliances that would automatically couple by impact when the knuckles were open and provided with levers extending outside of the car by means of which the knuckles could be opened, so that a coupling could be made or cars uncoupled, and where a railroad brakeman went between cars to open the knuckle of a coupling although the lever was in good condition, there could be no recovery on the theory that the railroad company should have provided automatic couplers, the knuckles of which would at all times be open and ready for coupling.

In Error to the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Action by Evalyn Charlton, administratrix of the estate of James H. Charlton, deceased, against the Chesapeake & Ohio Railway Company. There was a judgment for plaintiff, and defendant brings error. Reversed and remanded.

William Leigh Williams, of Norfolk, Va., for plaintiff in error.
John Winston Read, of Newport News, Va., for defendant in error.

Before PRITCHARD and KNAPP, Circuit Judges, and CONNOR, District Judge.

PRITCHARD, Circuit Judge. This action was instituted in the District Court of the United States for the Eastern District of Virginia by the administratrix of James H. Charlton, deceased, against the Chesapeake & Ohio Railway Company under the act of Congress known

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Rehearing denied February 8, 1918.

as the Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [Comp. St. 1916, §§ 8657–8665]) to recover damages on account of the death of James H. Charlton. There was a verdict and judgment for $12,000 in favor of the defendant in error in the court below. The plaintiff in error excepted to the refusal of the court below to grant certain instructions and to direct a verdict in its favor. The case comes here on writ of error.

In the course of this opinion defendant in error will be referred to as plaintiff, and the plaintiff in error as defendant; such being the relative positions of the parties in the court below.

On the night of the 5th of September, 1915, plaintiff's intestate was engaged as a brakeman by the defendant on its yards at Newport News, Va., and while thus employed he was crushed between two cars, and as a result of his injuries he died soon thereafter. It is conceded that at the time of the accident both the defendant and deceased were engaged in interstate commerce.

It appears that just prior to the accident an engine to which four cars were attached left the main track and moved to track No. 9, going in the direction of a single car standing still upon that track for the purpose of coupling the head car of the four cars to the standing car. It was the duty of Charlton to give the proper signals and to assist in making this coupling. As the moving cars approached the standing car it appears that he was riding upon the ladder step of the car next to the standing car.

C. M. Cox, a witness for the plaintiff, testified that he was the engineer in charge of the train at the time the injury occurred; that after leaving the lead track he moved on until he received the stop signal, that the cars struck at the first impact, and that he received this signal from some one riding on the sill step of the head car. It was shown by another witness that Charlton was riding on the sill step or ladder step. It further appears that the engine and the cars attached to the engine did not move after this signal was given until after Charlton was hurt. When the cars attached to the engine came into contact with the single car they failed to couple by the impact, and the standing car was pushed a distance of four or five feet away from the cars to which the engine was attached.

Witness Albright when asked what they were endeavoring to do said:

"We are going to back up to car No. 5. When the car upon which Charlton and I were struck, it knocked the car a distance of about four or five feet. They did not couple. Then he (Charlton) comes down to open the knuckle, and the car rolled back and caught him."

A little later on in his testimony this witness said:

"I don't know whether he went to open this knuckle or to fix it."

It appears that there was a very slight grade at this point, and, while Charlton was engaged in attempting to adjust the knuckle, the solitary car rolled back and caught him, causing the injuries from which he died the following day.

It further appears that at the point where Charlton received his injuries the track was straight. It is not shown why the deceased went

in between the cars. The witness Albright further testified that he was riding on the same car with the deceased, and that immediately after the cars came together he went to see what had happend, and found that deceased had been hurt. ·He also stated that he found the knuckle closed at that time; that if the knuckle had been open the cars would have coupled automatically. This witness also testified as follows:

"Q. State whether or not, Albright, these cars coupled automatically when they came together. A. Does it do it? Q. Do they? A. Yes, they couple all right if the knuckle is open. Q. If the coupler is in proper condition it couples automatically without the brakeman doing anything? A. Well, if it is on a straight track, you do not have to regulate it provided one of the knuckles is open."

John Morgan Hazelwood, a witness · for defendant, among other things, testified that he was a car inspector for the defendant company. He further testified as follows:

"I remember hearing of Mr. Charlton being killed, and soon thereafter, somewhere about 12:30 o'clock. four cars were brought to the lower yard and Conductor Massie pointed out two cars he said Charlton was mashed between. The conductor took the cars loose, separating them, and I inspected them, examined the drawheads, lock pins, the lift levers and all the parts, and made a memorandum at the time of my inspection, which I have with me. Examining that memorandum, I state that I found all the parts of these cars in perfect condition at the time I inspected them. * * * You can cut cars loose or you can throw open the knuckles by using the lever without going in between the cars. The couplers on these two cars are standard construction, ordinarily used in railroading, known as M. C. B. Standard—Master Car Builders' Standard."

·It further appears that the accident occurred between 9 and 10 o'clock in the evening, and, as we have stated, an examination of the appliances was made about 12:30 that night. Furthermore, it appears from the evidence that on a straight track there is no coupler known that will couple from impact where both of the knuckles are closed.

It is earnestly contended by counsel for plaintiff that section 2 of what is known as the "Safety Appliance Act" of March 2, 1893, requires the railroad to equip all cars with couplers which will automatically couple by impact; that this duty is positive; that any failure on the part of a railroad to properly equip its cars with automatic couplers renders it liable to the penalty prescribed by law, and that whenever one is injured on account of a failure of the railroads to equip their cars with automatic couplers, the question should be submitted to a jury with the view of having it determine as to whether such cars had been equipped in compliance with the statute; and that where the Safety Appliance Act is violated the questions of assumption of risk and contributory negligence are immaterial under section 2 of the act, · and also that the failure of an appliance to act is in itself sufficient to sustain a verdict in favor of the plaintiff. The section to which we have just referred is as follows:

"Sec. 2. *(Automatic Couplers)*—That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automat-

ically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

The defendant insists that the plaintiff's interpretation of the statute is erroneous; that, while it was the purpose of Congress to require railroads to furnish an appliance to couple cars together which would couple automatically by impact, Congress did not thereby intend to provide that, where the knuckles of a coupler by the motion of the train or otherwise should be closed, this of itself would be sufficient to render the railroad liable for a failure to comply with the statute, provided the appliance furnished was in perfect working order, which, of course, would include, among other things, the lever on the side of the car by which a closed knuckle could be opened without requiring an employé to jeopardize his life by going between the cars to adjust the knuckle.

Among other things the defendant requested the court to give the jury the following instruction:

"The court instructs the jury if they believe from the evidence that the cars between which the decedent, Charlton, was caught were each provided with standard automatic couplers which would couple by impact when the knuckles were open, and were provided with levers by which the knuckle could be thrown open without going in between the cars, and that these couplers were in good working order, and that there is no coupler known that will couple by impact while the knuckles are closed, then the jury should find their verdict for the defendant."

This instruction fairly presents the question as to whether the couplers were in working order, and the refusal by the court below to grant the same was tantamount to holding that it was the duty of the railroads, under the statute, not only to equip their cars with appliances that would automatically couple by impact, but that a coupler should be so constructed that the knuckles would be open at all times so as to permit a coupling to be made without operating the lever which extends outside the car, and that this lever was intended only to be used in uncoupling cars.

It is admitted that plaintiff's intestate's injury was due to an attempt on his part to effect a coupling of the cars by going between them to open the knuckle which had been closed. In this connection we must bear in mind that appliances like the one in use on this particular car are so constructed that the knuckle of the coupler could be easily opened and closed by a lever without going between the cars. It is apparent that the purpose of the act in question is to avoid the necessity of a brakeman or other employé engaged in making a coupling going between the cars for that purpose, and in obedience to the act the railroads of the country soon after its passage equipped their cars with couplers capable of being operated as we have stated. It clearly appears that the knuckle of the coupler, swinging as it does on hinges, is liable, in case of jar or other sudden movement, to swing inward and thus close the open space intended to receive the knuckle of the car sought to be connected with the train.

This court, in the case of Atlantic Coast Line R. Co. v. United States, 168 Fed. 175, 94 C. C. A. 35, in the first syllabus, in referring to the duty of the railroads, said:

"It was the manifest intention of Congress, in the enactment of the Safety Appliance Act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]) to require all common carriers engaged in interstate commerce to keep their cars and engines at all times equipped with proper safety appliances. The degree of diligence required by the statute is of the highest order, and the duty thus imposed is absolute and unconditional. Therefore any failure on the part of the railroad company to comply with its requirements must necessarily subject the railroad company to the penalty imposed."

The foregoing relates to the duty of the railroad to keep its cars properly equipped, at all times, with automatic couplers, but there is nothing contained therein to justify the contention that, where it appears, as in this instance, that the railroad has equipped its cars with couplers in perfect order and capable of being coupled automatically by impact, when properly adjusted, one who goes between the cars for the purpose of effecting a coupling and undertakes to open the knuckle without employing the lever which projects beyond the side of the car, and is injured, is entitled to recover either upon the theory that the railroad has failed to perform its duty or that it was negligent in not having a coupler the knuckle of which would at all times remain open. The deceased undoubtedly knew that all he had to do was to operate the lever and thus open the knuckle so as to effect the coupling, but for some reason he failed to make use of this appliance. If in this instance the coupler had been out of order or the lever had failed to operate so as to open the knuckle, then, under such circumstances, it would have been the duty of the court below to have submitted the question to the jury for its determination as to whether there had been a failure, in the first instance, to properly equip the car, and (2) as to whether the company had failed to keep the safety appliance in proper working condition.

However, plaintiff insists that the cases of Overstreet v. Norfolk & Western Railroad Co., 238 Fed. 565, 151 C. C. A. 501, Chicago, Burlington & Quincy Railroad Co. v. United States, 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582, Chicago, Rock Island & Pacific Railway Company v. Brown, 229 U. S. 317, 33 Sup. Ct. 840, 57 L. Ed. 1204, and other cases referred to in the brief, sustain its contention.

In the case of Overstreet v. Norfolk & Western Railroad Co., supra, it was alleged that a coupler on one of the locomotives, or some part of it, was out of order, which plaintiff alleged was the proximate cause of the death of deceased. The court below directed a verdict in favor of the defendant. This court in that case held that the court below was in error in directing a verdict, inasmuch as there was a conflict of evidence as to whether the coupler was in good order, and that under such circumstances the court should have submitted that question to the jury. While in the present case there is no evidence tending to show that the coupler was in a defective condition, we think it is established beyond peradventure that the coupler was in good condition and the knuckles of the same could have been easily manipulated by the lever if the deceased had chosen to adopt that method rather than going between the cars.

The case of Chicago, Burlington & Quincy Railroad Co. v. United States, supra, was a suit brought to recover a penalty for a violation of

the Safety Appliance Act.   There was evidence tending to show the de-
fective condition of all of the four cars, but the defendant sought to
relieve itself from liability upon the ground that it was ignorant of the
condition of the cars and had exercised reasonable care in inspecting
and had endeavored to keep the cars in repair.   The court in that case
announced, what is conceded to be the universal rule, that it was im-
material as to whether the defendant knew that its cars were out of
order; that the statute imposed upon it the positive duty of knowing
that they were in order and kept in order at all times.

In this case, however, plaintiff insists that the question as to whether
the cars were properly equipped is not to be considered; that the only
question to be considered is as to whether they failed to couple by im-
pact.   It will be observed at a glance that the above case is not in point,
and that the doctrine announced is inconsistent with the contention
made as to the rule which should govern in the case at bar.

In the case of Chicago, Rock Island & Pacific Railroad Co. v. Brown,
supra, the court, among other things, said:

"The railway company starts its contentions with a concession of its
own culpability in sending Brown to his duty to encounter defective appliances
and then seeks to relieve itself from liability by a charge against him of a
careless judgment in its execution."

The foregoing statement clearly distinguishes that case from the case
at bar, in that in this instance it is clearly shown, as we have stated,
that the appliances were not defective.   The Supreme Court in the case
from which we have just quoted also said:

"The cars were in motion on a car track at the time.   The uncoupling was
to be done by means of shoving the cars in motion.   Had the safety appliance
been in order, this could have been accomplished by defendant in error while
walking at the side of the train.   But the safety appliance on the side of the
car on which he was working at the time would not operate."

In that case the injured party, owing to the defective condition of the
safety appliance on the side of the car, under the stress of circum-
stances, felt impelled to go between the cars for the purpose of ad-
justing the pin, which could have been easily adjusted from the side of
the car if the appliance had been in working order.   While the first
headnote in the case tends to support the contention of plaintiff as to
the duty of the defendant, nevertheless, a reading of the opinion clearly
shows, as we have stated, that the case turned on an entirely different
point from the one involved in the case at bar.

Our attention was called in the argument to the case of San Antonio
& Aransas Pass Railway Company v. Wagner, 241 U. S. 476, 36 Sup.
Ct. 626, 60 L. Ed. 1110.   As we interpret the language of the court this
question was not passed upon.   The point decided in that case was that
the Safety Appliance Act applied to locomotives as well as cars.

We have carefully considered the other cases cited by plaintiff to
support her contention, but are of opinion that none of them are anal-
ogous to the case at bar.   Indeed, we have been unable to find any case
where the facts are similar to those of this case.

To construe this statute in accordance with the contention of counsel
for plaintiff would be to require the railroads to perform a duty which

appears, at this time, to be wholly impractical. The framers of the act only intended to require the railroads to furnish some kind of an appliance that would automatically couple cars and uncouple the same without exposing employés to the risks that were incident to coupling and uncoupling cars before the date of the passage of the act. The railroads, we think, have fully met this requirement by equipping their cars with an appliance that couples automatically by impact, and so arranged that if the knuckles should, for any reason, become closed that the same could be opened by using the lever at the side of the car, and thereby accomplished the obvious purpose of the statute, viz. to have the railroads so construct their couplers that it would be possible to couple and uncouple cars without going between them.

Therefore, in this instance, inasmuch as it appears that the cars were properly equipped with the safety appliances, in good working order, which could have been operated from the side of the car, thus avoiding the injury sustained by the deceased, the court below should have granted the instruction tendered by the defendant.

We thoroughly appreciate the financial loss that the widow has sustained in this instance, and regret that the facts are such as not to entitle her to recover. We, therefore, with reluctance, conclude that the judgment of the lower court should be reversed.

Reversed.