## ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. BOUNDS. (No. 2618.)

(Court of Civil Appeals of Texas. Texarkana. Nov. 9, 1922. Rehearing Denied Nov. 16, 1922.)

1. **Master and servant** ⚖➡111(1½)—**Violation of federal Safety Appliance Act requiring automatic couplers held not shown.**

Where, after an attempt to couple cars by impact had failed, a brakeman went between them to adjust the automatic coupler by hand and was injured when the cars backed down but which coupled on the second impact, the custom of brakemen using their hands to adjust couplers being voluntary, *held*, that the carrier was not liable on the ground it had violated the federal Safety Appliance Act (U. S. Comp. St. § 8606).

2. **Master and servant** ⚖➡111(1)—**Engine and cars switched not a "train" within federal Safety Appliance Act.**

Where three cars standing on a side track were to be taken from the side track and incorporated in the train, although the haul was only a short distance, it did not make the engine and the three cars being thus switched a "train" within federal Safety Appliance Act (Comp. St. § 8605), as amended in 1903 (section 8614), requiring trains in interstate commerce to be equipped with power brakes.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Train.]

Appeal from District Court, Smith County; J. R. Warren, Judge.

Action by Mrs. Bessie Bounds, temporary administratrix, against the St. Louis South-

---

⚖➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

western Railway Company of Texas. From judgment for plaintiff, defendant appeals. Reversed and remanded.

Marsh & McIlwaine, of Tyler, for appellant.

Johnson, Edwards & Hughes, of Tyler, for appellee.

HODGES, J. In February, 1921, L. C. Bounds, a brakeman in the service of the appellant railway company, was fatally injured while making a coupling between an engine and a freight car in the railway yards at Athens, Tex. Some time later his wife qualified as administratrix of his estate and filed this suit to recover damages for the pain and suffering endured by Bounds before his death and the injury sustained by her as a result of his death. She recovered upon both causes of action, the judgment aggregating $17,500. The suit is based on the alleged failure of the appellant to comply with the federal statutes (U. S. Comp. St. §§ 8605–8606) which require cars to be equipped with appliances which will couple automatically by impact, and with air brakes.

The testimony shows substantially the following facts: The freight train with which Bounds was connected arrived at Athens about 3:30 a. m. on the day of the accident. The crew had orders to pick up three box cars standing on a switch in the yards at that place and incorporate them in the train to be carried on to Tyler. After doing some other switching, the engine and tender were backed onto the side track, where those cars were standing. The rear brakeman, Hart, went ahead for the purpose of detaching the three cars wanted from the train of which they were a part and prepare them for movement. He "lined up the air," uncoupled the last of the three cars from its connection, and set the hand brake on the fourth car in the string, which was not to be moved. He also opened the angle-cock on the front car and closed it on the rear. Bounds rode the engine till it backed into the first car. After the impact he coupled the air hose between that car and the tender, opened the angle-cock on the tender, and gave the engineer the signal to go forward. The engine was moved about six feet and then was suddenly stopped by the automatic setting of the air brakes. It was then discovered that the attempt to couple had failed; that the air hose had been pulled apart at its coupling by the movement of the engine. This separation caused the brakes on the engine and tender to automatically set. Bounds then again went between the tender and the box car for the purpose of making the necessary adjustments. The circumstances indicate that he closed the angle-cock on the tender in order to release the brakes, and then attempted to adjust the knuckle of the coupler with his hands. While in that po-

sition, the three cars, which were standing on a slight incline, noiselessly rolled down against the tender, crushing Bounds between the two drawheads of the couplings. He called for help, and when assistance arrived he had fallen upon the ground across the rails. It was then found that the coupling had been effected by the impact. The engine was detached, connected onto the caboose, and Bounds was carried to Tyler for relief, but he died on the way. Some time later that morning the same engine returned to Athens for the purpose of taking up the same three cars and incorporating them in the train bound for Tyler. Another brakeman had taken Bounds' place.

It is conceded that the cars were equipped with automatic couplers of the kind required by the federal statutes, and also with a system of air brakes which would enable the engineer to control the speed of the train as required by another statute. The contention of the appellee is that the coupler was so defective that it could not be operated without the necessity of the brakeman going in between the cars, and that the air brakes on the three cars that rolled down against Bounds were so defective that they would not hold.

The evidence relied on by the appellee to show a defective condition of the couplers is, in part, the failure to make the coupling in the first impact at the time Bounds was injured, and in the first attempt after the return of the engine from Tyler to Athens. These circumstances are supplemented by the statements of several witnesses. Hart, a fellow brakeman with Bounds, testified, in substance, that he did everything he was supposed to do before the accident in preparing the three cars to be moved. When the engine pulled loose from the cars and broke the air connection, the angle-cock on the tender being open, the air brakes on the engine were automatically set. The angle-cock on the front car of the three was open when he got there after the connection had been broken. When the coupling came apart, Bounds was on the right side of the train, opposite the coupling. It was Bounds' duty to then go between the tender and the car and adjust the coupler so that the coupling could be made, and he did so. The brakes on the three cars did not hold them, and they moved gradually down towards Bounds—a distance of about six feet. On cross-examination he testified that the coupler on the tender of the locomotive was in good condition, as far as he could see. He did not examine the coupler on the car. He uncoupled the locomotive from the car by pulling the pin on the back end of the tender. He coupled and uncoupled that engine from other cars after that, some four times before leaving Athens. Williamson, for the plaintiff, testified that he had been employed as

machinist's helper and was familiar with automatic couplers on locomotives and cars. He had occasion to observe the coupler on this particular engine, No. 560, in October after the accident. At that time he opened and closed the knuckle of the coupler. He noticed that when opened it looked rather wide. If the knuckle of a car has too much play in it, it will allow the knuckle to pull open; and the pin having too much play probably will allow the knuckle to pull up far enough to open. This may be true although the couplers go together and the pin drops. His attention was at the time directed to the size of the coupler on the engine. It appeared to be undergage; it opened too wide. The coupling pin hung a little, and the knuckle joint seemed to be loose. When he took hold of the lever and with it tried to raise the pin and open the coupler, it hung. There are many different things that could make the pin hard to raise; it could be worn and could have offsets worn in it so that it would hang. It should not be necessary for a man to go between the cars to open a knuckle with his hands, for that is what the pin lever is for. When he used the lever on the coupler in question at the time stated, it opened the knuckle only part of the way. He then stepped in and pulled it the rest of the way open with his hand. On cross-examination he stated: "I never measured the opening on this coupler; don't know that it was a 9¼ inch opening," but thought it looked rather wide. When the pin lever is raised it lifts the pin and opens the knuckle. When he used the lever on the coupling on the occasion in question, he opened the knuckle. At the time he opened the knuckle with his hand after testing the lever, it opened easily. He did not know how much this one had worn, because he did not have any rule and did not measure it. He noticed it just by glancing at it. Tipton, a witness for the appellee, testified that he was the engineer operating the engine at the time Bounds was injured. He testified at some length relating to facts about which there is no dispute, and the proper construction of a coupling. On cross-examination he testified that the fact that a coupling is not always made does not indicate, by any means, that the drawhead is out of fix; there was not a trip made by him that he did not make three or four trials on some couplings where the couplers were all right. If there had been any defect in that coupling, using it as they used it on that occasion, he would have discovered it, he thought. "Sometimes the drawheads can be all right and we will make several trials in order to make the coupling." He made trial after trial with passenger coaches, and the same was true with reference to freight cars. In that case the failure to couple was not due to the fact that the coup-

ler had become worn and had too much play, for the couplings were not worn any; they were good couplings. The couplings on that engine and car were not in such condition as that it was necessary for a man to go in there to see whether the pin had fallen or not, but some brakemen do it anyway. He did not think it necessary for the brakeman to go in between the cars if he manipulates the lever. He knew that they had some brakemen that do; they also had brakemen who never went in between the cars. The lever was for the purpose of pulling the pin and opening the coupler. Gandy, the man who succeeded Bounds as head brakeman, and who accompanied the engine that morning on its return from Tyler to Athens, testified for the appellee. On his direct examination he stated that in attempting to couple onto the three cars before mentioned they had to make two or more trials before they succeeded. After the first trial he went in between the tender and the box car, and with his hands adjusted the knuckles by opening one and closing the other; to do that he had to go in between the cars. He did not know whether there was any defect in the drawhead on the car or not. On his cross-examination he stated that the fact that he did not make the coupling the first time was no indication that the drawhead on the car was in bad order. He did not know why it was that the car did not couple onto the engine; it was not out of fix, because if it had been he could not have coupled it. That was frequently the case with cars. In some cases you can open the knuckle, and in some you cannot, because some work easier than others. When recalled by the defendant, this witness testified that on the occasion referred to above he did not manipulate the lever to see whether or not it would open and shut the knuckle. He opened the knuckle with his hands because that was the usual way; that was done probably two-thirds of the time. The fact that it was necessary to make more than one effort to effect the coupling did not indicate any defect in the couplers, because that was often the case when the appliances were all right. In describing the conditions after his arrival at Athens and how he made the coupling, he said:

"When I stepped in there, the engine was five or six feet ahead; it might have been eight feet ahead. I don't want to create the impression that it was necessary for me to go between that tank and that car to make that coupling. * * * The only thing I did was I went in and adjusted it with my hand, without trying to adjust it with the lever. I don't know whether the lever would or would not have adjusted it had I tried to adjust it by that means. It is true that on the same knuckle there are times when it will adjust itself, and there are times when it will not, and that is true when there will be no defect in it."

Kirkland, a witness for the plaintiff, testified that the coupling ought to have coupled every time the engine was properly brought back against it. If the engine in fact made several attempts to couple with these couplings by coming back against it and it would not couple, then witness would not consider the coupling in good order. Witness had inspected the coupling on the car in question for the purpose of discovering defects, and had found none. Mullins, a witness for the defendant, testified that he held the position of federal engine inspector; that he had occasion to inspect the drawhead and the coupling appliance on engine 560 soon after Bounds had been killed, and he found no defects. He manipulated the lever, and found the lift in proper condition. The manipulation of the lever indicated that the lock worked freely and that the coupler was O. K. He lifted the lever and saw that it worked. He then opened and closed the knuckle and went around and applied the gage, and this showed that it did not have any wear. Other witnesses testified to an examination of these coupling appliances on the engine and that they were found in good order. Upon this testimony the jury found that the coupling appliances were defective and that those defects were the proximate cause of the injuries to Bounds.

[1] The federal Safety Appliance Statute makes it unlawful for any common carrier engaged in interstate commerce to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact and which can be uncoupled without the necessity of men going between the ends of the cars. U. S. Comp. Stat. § 8606. It is undisputed that the cars involved in this controversy were engaged in `interstate commerce and that this statute is applicable. It is conceded that the burden was on the plaintiff below to show that the coupling on one or the other of the cars was so defective that Bounds was required to go in between the tender and the box car on that occasion for the purpose of making the coupling. The evidence is undisputed that only one effort to couple the cars by impact was made before Bounds went in between the cars—presumably to adjust some part of the coupling appliance and to reconnect the air hose. The second impact, resulting from the rolling of the cars down against the tender, did effect a coupling. It is true that Bounds may have previously adjusted the knuckle with his hands and was caught between the drawhead while doing that; but there is no evidence that this adjustment could not have been made by Bounds by using the lever with which both the couplers were provided. There is no testimony tending to show that Bounds attempted to make any such adjustment of the knuckles of the engine tender or of the box car appliances

before he resorted to the use of his hands. He doubtless acted as he did because that method was easier and more speedy. Gandy, another brakeman, testified that the habit of using the hands for the purpose of adjusting closed knuckles was resorted to two-thirds of the time by brakemen. It may be that after the engine and tender were disconnected from the train, and before the attempt to couple with this particular car was made, the knuckle on the tender had been partially closed by the movement over the rails. There is nothing to indicate that it could not have been opened on that occasion by means of the pin-lifter.

Neither the language nor the purpose of the statute requires the equipment of cars with appliances that will operate with unfailing precision on every occasion. Such a degree of perfection is not essential to the safety of the employee, for whose protection the equipment is required. It may be expected from the very construction of such devices that in the course of time, and under the unavoidably varying conditions incident to railway traffic, there will be occasions when more than one impact may be required in order to effect a coupling. There is no attempt to show any rule requiring the employees to forego the use of the levers and substitute their hands after one or more failures to couple by impact. The custom of brakemen using their hands, as indicated above, was voluntary. It would be manifestly unfair to hold that the carrier had violated the statute until the inefficiency of the device had been disclosed by some reasonable test that would justify the conclusion that it was defective. Chesapeake & Ohio R. Co. v. Charlton, 247 Fed. 34, 159 C. C. A. 252; Id. (C. C. A.) 256 Fed. 988; Morris v. St. L. S. W. R. Co. of Texas (Tex. Civ. App.) 158 S. W. 1055. The first case above cited is very similar in its facts to the case here under consideration. That case was twice passed on by the Circuit Court of Appeals, and the evidence was held to be insufficient. Later the federal Supreme Court refused to grant a certiorari. See 249 U. S. 614, 39 Sup. Ct. 388, 63 L. Ed. 802.

[2] The jury also found that the air brakes with which the three cars in controversy were equipped were defective. The federal statute upon this subject is as follows:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train brake system, or to run any train in such traffic that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand-brake for that purpose." Compiled Stat. 1916, § 8605.

By an amendment adopted in 1903 (see section 8614) it was provided that—

"Whenever * . * * any train is operated with power or train brakes, not less than fifty per centum of the cars in such train shall have their brakes used and operated by the engineer," etc.

Authority was conferred upon the Interstate Commerce Commission to increase the percentage of cars in any train to be equipped with air brakes. Later the Commission increased the number to 85 per cent. of the cars in trains. It thus appears that railroad companies may operate trains with 15 per cent. of their cars without air brakes. Appellant contends that, conceding that the evidence was sufficient to show that the brakes on these cars were defective in the manner alleged, the statute has no application because the cars were not at the time a part of a train, within the meaning of this act. Hart, one of the brakemen, and whose testimony is not disputed, stated that when they reached Athens on their trip from Waco to Tyler they were to pick up the three cars referred to. Those cars were about 300 feet east or north from the depot at Athens. They had to set out something like three or four cars and pick up this string of cars to be carried on to Tyler. Those cars were to be pulled out from this side track and put into the train. That the statute does not apply to switching operations cannot be denied. United States v. C. B. & Q. R. Co., 237 U. S. 410, 35 Sup. Ct. 634, 59 L. Ed. 1023. The testimony referred to above clearly shows that the cars were standing on a side track; that the train was on another track—probably the main line. These cars were to be taken from the side track and incorporated in the train. The haul from that point, which is only a short distance, did not make the engine and these three cars being thus switched a train within the meaning of the statute. We think appellant's contention is correct, and that no judgment could be based upon the failure to have those cars at that time properly equipped with air brakes.

In answer to an interrogatory submitted, the jury found the defendant guilty of negligence in permitting the air brakes appliances on the cars to be in a defective condition, and that such negligence was a proximate cause of the injury to Bounds. Counsel for appellee contend that, even if there was no violation of a statutory duty to provide efficient air brakes on the cars, the above finding of the jury is sufficient to support the judgment based upon common-law negligence. This finding of the jury is attacked upon the ground that the evidence raises no such issue of common-law negligence. If the statute did not require that those cars, in that situation, be equipped with air brakes, there is no basis for the charge of negligence. The railway company would not have been guilty of any breach of duty to its employees if those cars had been equipped with only hand brakes, for they were not then in a train. The pleadings of the appellee do not charge, and the jury did not find, that Bounds was misled into relying upon the efficiency of the brakes to hold the cars and protect him from the collision that injured him. Hence, even if that be an issue raised by the evidence, it is not involved in this suit and cannot be relied upon to sustain the judgment rendered. The question before us is: Did the appellant owe Bounds the common-law duty of equipping those cars at that time, and under those circumstances, with air brakes? Certainly it did not. It therefore follows that the failure to do so was not an omission of which the injured man could complain.

For the reasons stated, the judgment will be reversed, and the cause remanded for another trial.