HENRY D. STEWART, APPELLEE, v. WABASH RAILWAY COMPANY, APPELLANT.

FILED MARCH 25, 1921. No. 21274.

1. Courts: DISMISSAL: FINAL ORDER. When, after a formal order sustaining a demurrer and dismissing a cause, the district court of the United States for the district of Nebraska gives leave to file an amended petition in the case, and retains the cause for further proceedings, this court will adopt the construction that court made of its order, and will not hold a judgment final which it refused to so consider.

2. Master and Servant: DEFECTIVE APPLIANCE. The uncoupling of the end car upon the stoppage of a train being backed is proof under the safety appliance acts that the coupling was defective.

3. ———: INJURY TO SERVANT: INTERSTATE COMMERCE. Under the facts stated in the opinion, the act of plaintiff when injured was so closely related to interstate commerce as to bring him within the operation of the federal employers' liability act.

Stewart v. Wabash R. Co.

4. ———: ———: Proximate Cause. The uncoupling of the car under the circumstances was the proximate cause of plaintiff's injuries.

5. Evidence as to the duties of switchmen and customs in the yards of other standard railroads *held* admissible.

6. Damages *held* excessive, and remittitur ordered as a condition of affirmance.

Appeal from the district court for Douglas county: Charles Leslie, Judge. *Affirmed on condition.*

*N. S. Brown* and *John L. Webster,* for appellant.

*Gerald F. Harrington, R. M. Johnson* and *M. F. Harrington,* contra.

Letton, J.

Appeal from a judgment in favor of plaintiff for damages for personal injuries. Plaintiff was a switch foreman in the freight and passenger yards of the defendant at Council Bluffs, Iowa. He was severely injured by being struck by the handle of a switch lever when he was endeavoring to open a switch upon a "Y" in the yards. Three box cars had been backed from the main line upon the west leg of the "Y" to be fitted with grain doors. Afterwards a number of other cars, variously estimated as from 7 to 8, and from 10 to 12, were backed in, pushing the three cars further along on the "Y." The evidence in behalf of plaintiff tends to prove that the latter cars automatically coupled to the three cars, but that when the engine stopped, the end car of the three became uncoupled and ran toward a switch at the point of the "Y;" that plaintiff saw that as the switch points were set the car would become derailed; that he immediately ran about 40 feet to the switch-stand and attempted to open the switch, when the wheels of the moving car struck the point of the switch, causing the switch-lever to be jerked out of his hand, and to strike him a severe blow in the groin, causing permanent injuries; that the car ran a short distance further and was stopped by another car which stood beyond the switch.

The evidence on behalf of the defendant implies that the accident was caused, not by the breaking loose of a car, but by the failure of the cars that were backed in to couple with the three cars already on the "Y," and that the impact caused the three cars still coupled together to enter the switch-point and throw the lever. This, however, is merely an inference from facts shown. Plaintiff identified the car which entered the switch as "M. & O." car No. 10055. There was evidence in behalf of defendant that no car of this number was in the yards that day, but it was shown by at least one of defendant's witnesses that cars of the Chicago, St. Paul, Minneapolis & Omaha Railway are commonly termed "Omaha" or "M. & O." cars by the railroad men, and that a Chicago, St. Paul, Minneapolis & Omaha car was one of the three cars mentioned.

Defendant's evidence does not disprove that plaintiff was injured by the switch lever, nor that the throwing of the lever was occasioned by the moving of the points of the switch by the wheels of the car. Quite a little time was devoted at the trial with respect to the identity of the car, but we think this was not very material when all the admitted facts are considered. While there is a sharp conflict upon some points in the evidence, we believe it is sufficient to justify the jury in believing that the switch-point was thrown by a car which had become detached from the others by reason of a defective coupling.

The first assignment of error is that the court erred in overruling a plea in bar of defendant. In substance this plea set out that plaintiff filed his petition in the United States District court for the district of Nebraska for damages arising out of the same accident; that a demurrer was sustained in this petition, and a judgment entered on November 10, 1917, which is in full force and effect and is a bar to the prosecution of this action.

On November 7, 1917, plaintiff filed a motion for permission to file, and was given leave to file and did file an amended petition. On December 10, 1917, defendant filed a plea to the jurisdiction, alleging the filing of an amended

petition; that this was in effect the commencement of a new action; and that the suit should have been brought in the district where the defendant is a citizen, and not in the district of Nebraska. On February 9, 1918, this motion was overruled. On February 13, 1918, plaintiff moved the court to dismiss the action without prejudice, and on that date the cause was so dismissed.

Appellant now insists that the order sustaining the demurrer and dismissing the cause was a final order. The journal entry is exceedingly brief. It is not stated that the cause is dismissed without prejudice, or with prejudice. We think it susceptible of the construction given to it by the court which made it; that is, that it was merely intended as a formal order sustaining the demurrer. The court did not regard the judgment as being final, because it retained jurisdiction and finally allowed the action to be dismissed without prejudice. So far as the record shows these proceedings were all had at the same term of court. The final judgment allowing the cause to be dismissed without prejudice apparently still stands. To hold that the federal court erred in allowing the amended petition to be filed, and afterwards in dismissing the cause without prejudice, would amount to a review by this court of the adjudications of the United States district court. Some authorities cited by defendant indicate that a federal reviewing court might have found the proceedings subsequent to the order made on November 10 erroneous. While the question is not entirely free from doubt, we construe the order as did the court which made it, and hold that it was not a bar to the present suit.

Plaintiff testified that, under similar circumstances, where a moving car, or cars, approaches a closed switch, unless the switch was open, derailment would probably occur or the company's property would otherwise be injured or destroyed, and it was his duty to open the switch, and that this was the custom in the yards of the defendant. He introduced the testimony of several other switchmen engaged in like work in the yards of various railroads

in Omaha, to the effect that the same custom prevailed in the Omaha yards, and in railroad yards generally. The same witnesses were examined with respect to their experiences as to the conditions in automatic couplers, and conditions in tracks, under like circumstances, which would cause cars to become uncoupled. This evidence was objected to on the ground that the matters inquired of are not controlled by any custom in the Omaha or other yards, and bear no relationship to the case on trial, or to the car or coupler in controversy, or to the switch-yards in question, or the happening of the accident involved in this suit. These objections were overruled, and the ruling is assigned as erroneous. The witnesses testified that some of the causes of defective couplers, according to their observation, might be worn knuckles, worn knuckle pins or worn locking blocks, and that when couplers are defective they are more liable to uncouple on a curved track than on a straight one; that such cars are apt to uncouple when there is a stop or a jerk when the slack runs out or in, which has a tendency to put a strain on the knuckles.

Appellant argues that all this testimony is inadmissible for the reasons given in the objections, and that it does not tend to prove that the coupler on the particular car in question was defective, nor that that car became uncoupled, and that it opened up collateral inquiries foreign to the case. It is difficult to draw any hard and fast line as to how far evidence of this kind may be admissible. The question at issue was whether the car became uncoupled through a defect in the coupling. The jury found that the car became uncoupled. Obviously if the coupler had been perfect this would not have happened. We are of the opinion that it was not improper to show that cars with defective couplers would become uncoupled under similar circumstances. Railroad cars and tracks on standard railroad systems are quite similar. It would have been entirely proper to show such occurrences and their causes if they had happened in the yards of defendant at Council

Bluffs. Would it make any material difference if the yards did not belong to defendant? There was no direct proof as to a defect in the coupler. The only fact shown was that when the engine stopped the car which had formerly been coupled became detached by force of its momentum. The obvious and fair inference is that the coupler was defective, and the testimony of these witnesses tended to show that under like conditions a like result would follow. We think the evidence was relevant to the question at issue.

In *Minneapolis & St. L. R. Co. v. Gotschall*, 244 U. S. 66, the jury were permitted to infer negligence from the fact that the coupler failed to perform its functions, there being no other proof of negligence. The supreme court held that the principle that negligence may not be inferred from the mere happening of an accident, except under the most exceptional circumstances, was not controlling in the case, "in view of the positive duty imposed by the statute upon the railroad to furnish safe appliances for the coupling of cars," citing many cases.

In *Texas & P. R. Co. v. Rigsby*, 241 U. S. 33, it was held that an employee of an interstate railway company is within the federal safety appliance acts, although not himself engaged in interstate commerce. In that case the employee was injured when taking a defective car to the shops for repairs. It was held that by these acts interstate railway companies are charged with an absolute and unqualified duty, irrespective of any question of negligence, to maintain the safety appliances, mentioned in the acts, upon railway cars used on a highway of interstate commerce.

In *San Antonio & A. P. R. Co. v. Wagner*, 241 U. S. 476, it was held that a violation of the federal safety appliance act (32 U. S. St. at Large, ch. 976, p. 943), by an interstate carrier, is in itself negligence rendering the railway company liable for the resulting injury to an employee under the employers' liability act of April 22, 1908 (35 U. S. St. at Large, ch. 149, p. 65, U. S. Comp. St. 1913, sec.

105 Neb.—52

8657), as being the result of a "defect or insufficiency, due to the employers' negligence, in its cars, engines, appliances," etc., within the meaning of the latter act. It is said in the opinion that the two statutes are in *pari materia,* and that, when the act refers to a defect due to negligence in its cars, "it clearly is the legislative intent to treat a violation of the safety appliance act as 'negligence'—what is sometimes called negligence *per se."* *Louisville & N. R. Co. v. Layton,* 243 U. S. 617; *Chicago, B. & Q. R. Co. v. United States,* 220 U. S. 559; *Texas & P. R. Co. v. Rigsby,* 241 U. S. 33; *Illinois C. R. Co. v. Williams,* 242 U. S. 462. We conclude that the detachment of the car sufficiently shows that the coupler was defective.

The appellant insists there can be no recovery because the plaintiff was not engaged in interstate commerce at the time he was injured, nor was the car, which was the cause of the injury, so engaged. This we consider the most serious question in the case. The proof shows that defendant is an interstate carrier with lines extending through Missouri, Iowa, and other states, and running passenger trains into Omaha. Plaintiff had worked as a switchman for defendant for seven years at Council Bluffs. He was acting as switch foreman and was working at the main freight yards on the day of the accident, in yards in which both interstate and intrastate traffic was handled. The three cars were taken from track seven in the yard, and were brought down the main line and pushed upon the "Y." One of the cars belonged to the Chicago, St. Paul, Minneapolis & Omaha Railway Company, and another to the New York Central Railroad Company. The engineer testified that, after he coupled on to eight or nine other cars, he was given a signal to clear the main line. The main line was used for both interstate and intrastate commerce. The car which broke loose was the end one of this string of cars which was being pushed on the "Y" for the purpose of clearing the main line. This fact, in connection with the other circumstances in the case, is

sufficient to show that the moving of these cars was so close-ly related to interstate commerce that the jury properly found that plaintiff was engaged in such commerce at the time of the accident. *New York C. & H. R. R. Co. v. Carr*, 238 U. S. 260; *Pennsylvania Co. v. Donat*, 239 U. S. 50; *Great Northern R. Co. v. Otos*, 239 U. S. 349; *Seaboard A. L. R. Co. v. Koennecke*, 239 U. S. 352; *New York C. R. Co. v. Porter*, 249 U. S. 168; *Kinzell v. Chicago, M. & St. P. R. Co.*, 250 U. S. 130; *Pedersen v. Delaware, L. & W. R. Co.*, 229 U. S. 146.

Appellant strongly contends that the detachment of the car was not the proximate cause of the injury. The court instructed the jury: "By the term 'proximate cause' is meant that cause which was the direct and immediate cause that produced the result complained of, and without which that result would not have occurred." Appellant complains of this instruction, and argues that, if plaintiff had not lifted the switch handle, he would not have been injured; that he created the condition which caused the injury; that his action was an efficient intervening cause without which the result would not have occurred and that consequently the uncoupling of the car of itself was not the cause of the accident. The testimony shows that it was the duty of the plaintiff upon seeing a car or cars, running into a closed switch, which would probably cause derailment or injury to the company's property, to open the switch.

Some witnesses for defendant testify that in all probabil-ity the damage if the switch had not been opened might have been slight in degree; that the car may have been de-railed, or the switch rod broken, with slight cost for repairs, but this we think is not controlling. Quick action was nec-essary in order to prevent injury to defendant's property, and plaintiff was in the course of his duty in endeavoring to prevent it. There was no time for a balancing of the probabilities. If the switch was not turned, damage in some degree would result; if it was turned in time, no in-jury to property would happen. Plaintiff testifies that, if

he had failed to act and damage had resulted, he would have been discharged. This is not contradicted. Considering this duty owed by him, we take his action to be not an independent intervening cause, but a part of a chain of circumstances which would naturally be set in motion by the uncoupling of a car in such a situation. *Chicago, R. I. & P. R. Co. v. Brown,* 229 U. S. 317. The uncoupling of the car was the first act in a series of events which would naturally, in view of all the circumstances, be apt to occur; that is, the act which would naturally be expected to occur would be an attempt by the switchman to stop the car in time to prevent damage, or to turn a switch in time to effect the same purpose. If in this attempt injury occurred, it would be a natural sequence to the first act or default.

It is complained that the damages are excessive. The verdict was for $26,500. Plaintiff is 29 years old and his expectancy is 36.03 years. He was earning $115 a month at the time of the accident November 15, 1916. Wages of switch foremen are now about $5 a day. He was operated on at a hospital in Council Bluffs soon after he was hurt and remained there two weeks. In January 1917 an operation for varicocele in the left groin was performed on him at the Wabash hospital in Moberly, Missouri, where he remained three weeks. In June, 1917, he suffered an operation by Dr. Dwyer, at St. Joseph's Hospital in Omaha, who loosened up scar tissue and removed the remains of the left testicle and spermatic cord. He testifies that he is able to walk around as he desires, but complains of nervousness and loss of sleep to some extent, and is only capable of sexual intercourse once a month. Dr. Kelly, a specialist in nervous diseases, testified that he examined him in July, 1917; that his smell and vision were normal, no disturbance in equilibrium, physical power diminished but equal on both sides, no ataxia, neither anesthesia, analgesia nor paresthesia, no deep tenderness or nerve trouble, nor abnormality except the scars due to his accident and the operations which followed. He evinced great pain on examination of the region of the spermatic cord.

Plaintiff testified he was not able to do manual labor and had not enough education to perform clerical work, and his wife testifies he is only able to do light work about the yard. Plaintiff is able to walk about without pain or difficulty and is able to do light work. He suffered three operations resulting in great pain for limited periods, but, though nervous, his bodily functions aside from his impaired sexual powers are not far from normal, according to his own physician. He has lost weight to a great degree, but in July, 1917, the doctor says he was "of muscular build and well developed." Considering the income which money brings in sound investments, and all the evidence, we think the verdict is excessive and must have been, to some degree at least, the result of prejudice. The judgment is reversed unless plaintiff within 20 days files a remittitur of $10,000. If this is done it will stand affirmed.

AFFIRMED ON CONDITION.

FLANSBURG, J., not sitting.