43454. HIGGINS v. D & F ELECTRIC COMPANY.

ARGUED FEBRUARY 5, 1968—DECIDED APRIL 8, 1968— REHEARING DENIED APRIL 24, 1968—CERT. ■

*Donald D. Smith, Smith, Currie & Hancock, Overton A. Currie,* for appellant.

*Greene, Buckley, DeRieux, Moore & Jones, Burt DeRieux, James A. Eichelberger,* for appellee.

EBERHARDT, Judge. 1. (a) Error is enumerated upon failure of the trial court to charge on estoppel to deny agency and on ratification "by a principal of an apparent agent's tort" (sic), and upon the exclusion of certain testimony as to the cause of death. Assuming that such matters are error, or that the charges contended for had been given and the proffered evidence admitted, a verdict in favor of defendant company on the issue

of liability was nevertheless demanded by the evidence, and hence a reversal is not required. Cf. *Burgamy v. Morris*, 219 Ga. 776 (135 SE2d 868).

(b) As to the allegation of negligence of the company in failing to provide supervision, direction and guidance to Cash, there was no evidence to raise such a duty. The president of the company testified that the company's only interest in the matter was to see that the finished job met the standards required by the electrical code and was acceptable to the inspection department of the governmental agency. Day-by-day supervision was not contemplated by anyone involved. Plaintiff herself testified: "Q. Did you ever complain to Mr. Fink (president of the company) or to anybody else that he wasn't there to supervise the work? A. No, because he had to come and inspect it, I thought he would come and inspect it later. It was not at a point he could have until Roy (Cash) had finished what he came to do that day. Q. The thing is, is this true, Mrs. Higgins, you didn't expect him to be there supervising the job, did you? A. Not at that point, later yes, to come and see what was going on. He was furnishing the permit, he had a big part in it. Q. Up to the time that your husband died you did not expect him to come? A. That's right, the work wasn't ready yet. Q. May I finish my question please, ma'am. Up to the time your husband died you did not expect Mr. Fink to supervise the job in any way, did you? A. That's right."

(c) The remaining theory of liability is that of respondeat superior for the negligence of Cash. The *sine qua non* of this aspect of the case as pleaded is that Cash enlisted decedent to operate the drill and bore holes in the joists. There is absolutely no evidence to support these allegations, and the positive evidence is to the contrary. The only witnesses who had been present at the scene were plaintiff and Cash. The extent of plaintiff's testimony was that decedent was in the basement when she called him for lunch, and he replied that he was helping Cash but would be up in a few minutes. This testimony was offered and allowed solely for the purpose of impeaching the testimony of Cash, and is not itself proof of any fact related.

*Mathis v. State,* 210 Ga. 408 (80 SE2d 159). In any event plaintiff also testified that she didn't know what decedent was doing in the basement. Cash testified by deposition that on occasion the decedent, when requested to do so, would help him by handing materials and by assisting in putting the wire through holes in the finished rooms. Cash always told decedent exactly what he wanted done, and decedent had never done any work that Cash had not instructed him to do. Decedent had not actually assisted in the basement of the house but had been down watching from the finished area of the basement while Cash was working in the crawl space, where decedent was subsequently found ill or injured. Cash had been drilling holes in the floor joists in the crawl space so that wires could be run through them and, thinking that he had completed all of the drilling which needed to be done, went outside to work on the meter box. The drill was left in the basement at the edge of the crawl space. Cash had not placed any marks on the joists where holes were to be drilled. Decedent was not in the basement when Cash left (Cash thinking him to be in the new den), and the next Cash knew of decedent's being in the basement was some twenty or thirty minutes later when decedent's son came running out to say that something was wrong with his father. In addition Cash testified: "Q. All right. Did you have any conversation with him (decedent) about you asking him to help do any drilling or drilling of holes? A. No, I did not. . . Q. On this particular morning, about drilling, did you tell him to drill any holes? A. I did not. Q. Did you ask him to drill any? A. No, I did not. Q. Did you know he was going to drill any? A. No, I did not. . . Q. At any of those conversations to any person, did you ever say that you had told Mr. Higgins to drill any holes in the basement at all? A. I have never told him to drill a hole in the basement. Q. Did you ever tell anybody you did? A. No, I did not. . . Q. And he had not done any work on that house, any electrical work on that house that you had not specifically instructed him to do, had he? A. He went down there and bored and I sure didn't tell him to. . . Q. So you don't know why Mr. Higgins went down to the basement area? A. I don't. . . Q.

And you didn't tell him where to drill any holes? A. I did not. Q. But you didn't ask him to do any drilling? A. No. I didn't. Q. And you don't know why he went down and started drilling? A. No, I don't. That's the truth. . . Q. Did you at any time point out to Mr. Higgins that that wire was there? A. No. My recollection, no. I didn't figure that it was no use in pointing it out to him. Q. Did you ever give Mr. Higgins any instructions as to how to use this drill? A. No, I didn't. . . Q. You never gave Mr. Higgins any instructions as to how to operate this drill? A. No. Q. Did you ever ask him to watch you operate it? A. No. Q. Did you ever ask him to operate it? A. Not that I recall, no. A. But you are not certain that you didn't ask him to operate it, are you? A. I wouldn't be afraid to bet on it that I told him not to. Q. But you are not certain that you didn't ask him to operate it? A. Well, it's been so long I can't recall. Q. And you may have asked him to operate it? A. No, I don't—I'd say I wouldn't ask him to operate it. Q. All right. You are certain that you did not ask him to operate it? A. Yes. Q. And you never observed him operate it at any time? A. To my knowledge, no."

Under this evidence we must conclude that a finding was demanded that Cash had not enlisted decedent to bore holes with the drill and that Cash had no knowledge or reason to anticipate that decedent would attempt to do so. Hence the enumerations of error, even if meritorious, do not require reversal under the circumstances here. Cf. *Burgamy v. Morris*, 219 Ga. 776, supra.

Even if it be said that there was some circumstantial evidence indicating that the decedent may have been working under Cash's direction, the unimpeached, uncontradicted, positive testimony of Cash demanded a contrary finding. *Frazier v. Ga. R. &c. Co.*, 108 Ga. 807 (33 SE 996) ; *Taggart v. Savannah Gas Co.*, 179 Ga. 181 (1) (175 SE 491) ; *Myers v. Phillips*, 197 Ga. 536 (4) (29 SE2d 700) ; *Emory University v. Bliss*, 35 Ga. App. 752 (134 SE 637) ; *Western &c. R. v. Gentle*, 58 Ga. App. 282, 297 (198 SE 257) ; *Slaton v. Atlanta Gas Light Co.*, 62 Ga. App. 42 (7 SE2d 769) ; *Allgood v. Dalton Brick &c. Corp.*, 81 Ga. App. 189 (4) (58 SE2d 522) ; *Spruell v. Ga. Automatic &c. Co.*, 84

Ga. App. 657, 664 (67 SE2d 178); *Johnson v. Webb-Crawford Co.*, 89 Ga. App. 524 (80 SE2d 63).

*Judgment affirmed. Felton, C. J., and Whitman, J., concur.*