79 F.Supp. 365 (1948)
AFFOLDER
v.
NEW YORK, C. & ST. L. R. CO.
No. 5773.
District Court, E. D. Missouri, E. D.
July 28, 1948.
*366 Mark D. Eagleton, of St. Louis, Mo., for plaintiff.
Jones, Hocker, Gladney & Grand and Lon Hocker, Jr., all of St. Louis, Mo., for defendant.
HULEN, District Judge.
Plaintiff was employed by defendant as a switchman in its yards in Fort Wayne, Indiana. On the night of September 24, 1947 defendant was engaged in a switching operation of freight cars. Two of the cars failed to couple automatically by impact, *367 with the result that part of the cut of cars farthest from the engine, by reason of the failure to couple automatically on impact, commenced to move down grade on the switch track. It was plaintiff's duty to stop such a movement. Plaintiff was in a place of safety some distance from the track the movement was on, and upon seeing the cars moving immediately started toward them at a rapid gait, with the intention of going on the cars and setting the brake to stop the movement and avoid damage that might otherwise result. When he had reached a point near where he intended to board one of the cars, for some unexplained reason he slipped or tripped and fell. His right leg went over the rail, the car passed over it, and he received injuries which resulted in its amputation, leaving a stump about four inches long. At the time of injury he had been employed by defendant about seven and one-half years. He was earning approximately $400 per month. He was thirty-five years of age. He testified his leg had given him constant pain since injury was received and he had lost some thirty pounds in weight. A doctor called by plaintiff testified the scar on the stump was adherent and painful, that there was a "hot spot" at the end of the nerve, and that further surgery will be required to shorten the bone and remove scar tissue to relieve the pain and permit plaintiff to wear an artificial limb. The doctor was guarded in his opinion as to extent of success with which plaintiff could wear an artificial leg. Because of the shortness of the stump a special type of "table" artificial limb would be required. The flection of the limb is markedly reduced. There was no injury suffered to any other part of his body. The jury returned a verdict for plaintiff for $95,000. Plaintiff's case was based on the Safety Appliance Acts, 45 U.S.C.A. §§ 1-46,  that defendant permitted cars to be used on lines controlled by it which were not equipped with couplers coupling automatically on impact.
Defendant argued and has briefed three assignments of error:
(1) The charge to the jury failed to submit defendant's theory of the case.
(2) The verdict is excessive.
(3) There is a failure of proof that violation of the Safety Appliance Act was the proximate cause of plaintiff's injury.
I. That portion of the charge complained of reads as follows:
"The Court instructs the jury that under the law in this case the defendant had an absolute and continuing duty not to haul or use on its line any car not equipped with couplers coupling automatically by impact, and it was not only the duty of the defendant to provide such couplers, but it was under the further duty to keep them in such operative condition that they would always perform their functions. Therefore, the plaintiff, in order to discharge the burden of proving a breach of this duty, is not required to prove the existence of any defect in any such coupler, but need only prove that any such coupler did in fact fail to couple automatically by impact."
By brief defendant states its position with reference to the charge as follows:
"This instruction, which was not modified or conditioned by others parts of the charge, was in effect a direction to find for the plaintiff. There was no question that the cars did not couple upon impact. The only question was as to the cause of the failure. Defendant contended that there was no inherent defect in either coupler which caused them not to couple, but a failure of Tielker, the switchman, to open the knuckles before the impact. Your Honor's charge as quoted deprived defendant of this theory of defense, for plaintiff had only to `prove that any such coupler did in fact fail to couple automatically by impact.'"
The charge must be considered as a whole. The jury was so instructed. We cannot agree with defendant the charge was susceptible of interpretation by the jury as a "direction to find for the plaintiff", or that the charge "deprived defendant of this theory of defense". When-considered as a whole we believe defendant's "theory of defense" was presented to the jury. As set out in defendant's brief the case was tried by defendant and its defense was "that there was no inherent defect in either coupler which caused them *368 not to couple, but a failure of Tielker, the switchman, to open the knuckles before the impact" which was the cause and failure of the coupling to couple on impact. If the plaintiff's injuries resulted from the action of Tielker, as urged by defendant, negligence of a fellow servant, to-wit Tielker, was the proximate cause of plaintiff's injury and not violation of the Safety Appliance Act by defendant.
Going directly to defendant's claim that its theory of defense was not submitted and therefore defendant was "deprived" of it, following that part of the charge isolated and quoted by defendant in its brief the following appears in the charge:
"Now, I charge you in this case that if you find and believe from the evidence that at the time and place mentioned in evidence, defendant was hauling or using on its lines one or more cars equipped with couplers which did not couple automatically on impact, and that by reason thereof a separation occurred between the Pennsylvania hopper car and the Rock Island box car, and that said separation was to a failure on the part of the couplers of either car to function properly and to couple automatically on impact, then in that event you are instructed that the defendant violated the Safety Appliance Act that I have referred to."
It will be seen from this portion of the charge that coupled conjunctively with the requirement that the jury find that the cars were equipped with couplers that did not couple automatically on impact, the jury must also find that the separation "was due to a failure on the part of the couplers of either car to function properly * * *". The jury was further charged:
"On the other hand, if you should find and believe from the evidence that the separation of the cars, that is, the Pennsylvania car and the Rock Island car, was due to some other cause, that a failure to provide couplers coupling automatically on impact did not cause it, or that the separation of the cars, regardless of its cause, was not the proximate cause of plaintiff's injuries, then your verdict in this case should be for the defendants."
Following the above paragraph the jury was told that plaintiff did not found his claim upon negligence, and with respect to the conduct of Tielker, which defendant claims was the cause of the failure of the couplers to couple automatically on impact, the jury was specifically instructed:
"But similarly, plaintiff has no right to recover in this suit for any negligence of the defendant, if any has been shown; so you can not hold the defendant liable in this case for any act or failure to act of Tilker, who said he was a pin man in the engine crew, and as I recall, he testified lto opening the coupling so it would couple on contact, but he said that the car to which it was being shoved or kicked, or any other employee, or any defect or obstruction in the condition of the yards, that it not in this case."
Counsel for plaintiff and defendant argued their respective positions fully before the jury. The charge was in conformity with their argument. We believe the subject was covered sufficiently by the charge that there could be no misunderstanding by the jury and defendant is without any basis for this assignment of error.
II. The verdict in this case is large. The question is whether it is so excessive as to call for interference by the Judge  a course we adopt only if it appears the jury disregarded the instructions as to measure of damages. Bearing in mind the extent of plaintiff's injuries, his education, station in life, and character, and viewing the evidence as to damages most favorable to plaintiff in the light of the rule that amount of damages is primarily for the jury to determine, we believe his earning capacity, on recovery, should be at least approximately 40% of what it was prior to injury.
In the case of Gulf, C. & S. F. Ry. Co. v. Moser, 275 U.S. 133, 48 S.Ct. 49, 72 L.Ed. 200, the Supreme Court referred to the case of Chesapeake & O. R. Co. v. Kelley, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117, L.R.A.1917F, 367, as announcing an applicable rule to compute damages recoverable for the deprivation of future benefits, and referring to the Kelly case said [275 U.S. 133, 48 S.Ct. 50]:
"The interpretation approved by us has become an integral part of the statute. [Federal Employers' Liability Act, 45 U.S. *369 C.A. § 51 et seq.] It should be accepted and followed".
In the Kelly case the Supreme Court said [241 U.S. 485, 36 S.Ct. 632]:
"* * * in computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only."
In determining the present value of payment for future earnings the Court said:
"* * * But, as a rule, and in all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award.
"We do not mean to say that the discount should be at what is commonly called the `legal rate' of interest; that is, the rate limited by law, beyond which interest is prohibited. It may be that such rates are not obtainable upon investments on safe securities, at least, without the exercise of financial experience and skill in the administration of the fund; and it is evident that the compensation should be awarded upon a basis that does not call upon the beneficiaries to exercise such skill, for where this is necessarily employed, the interest return is in part earned by the investor rather than by the investment. * * *
"Ordinarily a person seeking to recover damages for the wrongful act of another must do that which a reasonable man would do under the circumstances to limit the amount of the damages. [Citing cases.] And the putting out of money at interest is at this day so common a matter that ordinarily it cannot be excluded from consideration in determining the present equivalent of future payments, since a reasonable man, even from selfish motives, would probably gain some money by way of interest upon the money recovered. Savings banks and other established financial institutions are in many cases accessible for the deposit of moderate sums at interest, without substantial danger of loss; the sale of annuities is not unknown; and, for larger sums, state and municipal bonds and other securities of almost equal standing are commonly available."
Plaintiff, by brief, to sustain the award of the jury, as to the amount of future earnings represented in the verdict presents figures based on an annuity discount rate of 2½%. Following that formula, plaintiff, being thirty-five years of age, with an income of $400 per month, and an expectancy of thirty-seven years plus, and assuming a loss in earning capacity of approximately 60%, plus loss of earnings to the date of trial, the sum of $70,000 for damages sustained by plaintiff under this heading would not be so excessive as to justify, in our opinion, the Judge in declaring the jury disregarded the instructions on the measure of damages.
In addition to loss of earnings plaintiff is entitled to such sum as would reasonably compensate him for past and future pain and suffering and loss of leg, as a matter of disfigurement, embarrassment and inconvenience.
The cases cited by the parties do not help a great deal in deciding the question presented. On the other hand we believe there should be some attempt at uniformity rather than a total disregard of the judgment of other courts. In 1944 the District Court for the Southern District of New York, in McKinney v. Pittsburgh & L. E. R. Co., 57 F.Supp. 813, had before it a case under the Federal Employers' Liability Act where plaintiff, 43 years of age, with earnings of approximately $2800 a year, suffered the loss of both feet between the ankle and knee. The verdict of $130,000 was reduced to $100,000. In the same year the District Court for the Eastern District of New York, in Cunningham v. Pennsylvania R. Co., 55 F.Supp. 1012, 1013, considering the subject of excessive verdict in a case under the Federal Employers' Liability Act, had before it a plaintiff 38 years old, with income of $2900 per year, where a verdict of $60,000 had been rendered. Plaintiff was a brakeman and lost his right leg three and one-half inches *370 above the knee. At the time of trial, eight months after injury, his leg was sufficiently healed to be ready for an artificial limb. In reducing the verdict from $60,000 to $40,000[1] the Court said:
"* * * it is pertinent to note that research of counsel and the court has unearthed no case of an allowance of $60,000 for the loss of one leg".
Faced with a demand for an answer as to what is reasonable and fair compensation for an injured person such as plaintiff under the circumstances of this case, we are bound to reply, who can determine within any degree of accuracy what amount of money will compensate plaintiff for the pain and suffering he has sustained and in all probability will undergo in the future, and the other intangibles involved in the question. Yet we cannot escape the belief in this case that the sum agreed upon by the jury exceeds what has heretofore been determined to be a fair sum, and we say this with what we consider due allowance for the change in economic conditions that has resulted in substantial reduction in purchasing power of the dollar for the necessities of life.[2] If no Court had approved a verdict of $60,000 for loss of a limb up to 1944, a verdict of $95,000 four years later is excessive. Considering all the circumstances referred to and injuries sustained by plaintiff, a sum of $80,000 in the present case would be fair compensation to the plaintiff and any amount above $80,000 would be excessive.

Order
Plaintiff will file a remittitur within ten days for all sums in excess of $80,000.00.
III. Defendant's assignment that the evidence fails to sustain plaintiff's charge that violation of the Safety Appliance Act was the proximate cause of plaintiff's injuries presents a close question under the authorities. There is no dispute in the record how plaintiff came by his injuries. Due to failure of two of the cars in a switching movement to couple automatically by impact, that portion of the cut of cars farthest from the engine started to move away from the engine because of grade of the track. Plaintiff had a duty under the circumstances to stop the movement. On seeing the cars moving he did not hesitate but started immediately toward the moving cut of cars at a rapid gait, with the intention of going on the cars and stopping the movement by setting the brake on one of the cars. While rushing to the movement, for some unaccounted reason, he was caused to fall and his right leg went under the wheels of one of the cars, causing his injuries. He had almost reached the car which he intended to board at the time of his fall. It is the position of defendant that plaintiff was not, at the time of injury, engaged in an operation for which the Safety Appliance Act was designed to furnish him protection. Defendant argues it was not the separation of the cars which caused plaintiff's injury. When plaintiff approached the cars he was not interested "in the coupling device, but in the brake", and that when he saw the movement of the cut of cars "the situation would have been identical, so far as Affolder's duties and reactions were concerned, whether the separation was intentional or accidental." Defendant seeks a ruling, the separation was "an incidental situation" in which the accident, otherwise caused, results in the injury to plaintiff.
The rules governing determination of proximate cause as set forth in Restatement of the Law of Torts, Vol. II, §§ 430-443, are approved by the Eighth Circuit in Chicago, M., St. P. & Pac. R. Co. v. Goldhammer, 79 F.2d 272, loc.cit. 274:
"`Sec. 435. Foreseeability of Harm or Manner of its Occurrence.
"`If the actor's conduct is a substantial *371 factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable'.
"`Sec. 443. Dependent Intervening Force.
"`An intervening act of a human being or animal which is a normal response to the stimulus of a situation created by the actor's negligent conduct, is not a superseding cause of harm to another which the actor's conduct is a substantial factor in bringing about.
"`Comment:
"`a. The rule stated in this Section applies not only to acts done by the person who is harmed or by a third person as a normal response to the situation created by the defendant's negligence, but also to acts of animals reacting thereto in a manner normal to them. * * *'
"We think these statements clearly and correctly express the rules which should govern the rights of the parties to the present controversy."
There are many cases on the subject and while there seems to be no difficulty in determining the rule that should apply under circumstances such as presented by the present record, the difficulty is application of the rule to the case. The language of Mr. Justice Cardozo in Wagner v. International R. Co., 232 N.Y. 176, 133 N. E. 437, 19 A.L.R. 1, is not without help:
"Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable. The wrong that imperils life is a wrong to the imperiled victim; it is a wrong also to his rescuer. * * * The risk of rescue, if only it be not wanton, is born of the occasion. The emergency begets the man. The wrongdoer may not have foreseen the coming of a deliverer. He is accountable as if he had. * * * there must be unbroken continuity between the commission of the wrong and the effort to avert its consequences; * * * Continuity * * * is not broken by the exercise of volition. * * * whether plaintiff, in going to the rescue, as he did, was foolhardy or reasonable in the light of the emergency confronting him, were questions for the jury."
Most of the decisions on this question since 1923 base their reasoning on the case of Davis v. Wolfe, 263 U.S. 239, 44 S.Ct. 64, 68 L.Ed. 284. The substance of that opinion as it applies to the present case rules against defendant in so far as its claim is based on the proposition that plaintiff was not engaged in an operation for which the Safety Appliance Act was designed to furnish him protection at the time of injury. The Court quotes with approval from the opinion in Louisville & Nashville Railroad Co. v. Layton, 243 U.S. 617, 37 S.Ct. 456, 61 L.Ed. 931:
"While it is undoubtedly true that the immediate occasion for passing the laws requiring automatic couplers was the great number of deaths and injuries caused to employees who were obliged to go between cars to couple and uncouple them, yet these laws as written are by no means confined in their terms to the protection of employees only when so engaged. The language of the acts and the authorities we have cited make it entirely clear that the liability in damages to employees for failure to comply with the law springs from its being made unlawful to use cars not equipped as required  not from the position the employee may be in or the work which he may be doing at the moment when he is injured. This effect can be given to the acts and their wise and humane purpose can be accomplished only by holding, as we do, that carriers are liable to employees in damages whenever the failure to obey the safety appliance laws is the proximate cause of injury to them when engaged in the discharge of duty." [263 U.S. 239, 44 S.Ct. 66.]
A case in some respects like the present one is New York Cent. R. Co. v. Brown, 6 Cir., 1933, 63 F.2d 657, 658, where judgment for plaintiff was affirmed. In the Brown case the suit was brought under the Safety Appliance Act. Plaintiff was a brakeman employed by the defendant. Due to the failure of an automatic coupler *372 a car started a down-grade movement. Brown was in a position of safety and seeing the car start, and realizing lest it be stopped it might cause injury, went on the car for the purpose of setting the brake, and had reached a position where he was reaching for the brake wheel when his head brushed an overhead electric rail which caused him to fall to the ground and sustain the injuries sued for. In the Brown case, as in this one, violation of the Safety Appliance Act as the proximate cause of the injuries was for ruling. Disposing of it the Court said:
"But it has long been settled that the chain of causation is not broken by an intervening act which is a normal reaction to the stimulus of a situation created by negligence, and such normal reaction has been held to include the instinct toward self-preservation, Scott v. Shepherd, 2 W. B1. 892 (the lighted squib case,) and the equally natural impulse to rush to others' assistance in emergency, Wagner v. International Railway Co. (Cardozo, C.J.), 232 N.Y. 176, 133 N.E. 437, 19 A.L.R. 1 (the danger invites rescue doctrine). This rule of causation has been repeatedly recognized by this court. Sandri v. Byram 6 Cir., 30 F.2d 784, 786; Erie Railroad Co. v. Caldwell, 6 Cir., 264 F. 947."
The point on which the cases turn on the proximate cause issue, as we understand them, is set forth as follows: "to determine whether there was a continuous succession of events leading proximately from fault to injury, the test is not whether the plaintiff was acting in performance of his duty when injured, but whether his act was a normal response to the stimulus of a dangerous situation created by the fault."
A fact in the Brown case considered by the Court was that the moving car was traveling in the direction of a tunnel and while no train was seen or heard coming through the tunnel, the question was posed by the Court  "if reasonable men might fairly differ" upon the point whether the danger was so imminent "as to make Brown's hurried effort reasonably a normal response to the stimulus of apprehended danger." We endeavored to instruct the jury fully on this aspect of the law as determinative of whether violation of the Safety Appliance Act was the proximate cause of plaintiff's injury, and to the charge in that particular no exception was taken. In principle we can see little difference between the plaintiff in this case and the plaintiff in the Brown case. Each was injured by a fall before he reached the point where his efforts could become effective in the performance of his duty in stopping the moving cars, one before he had boarded the car, the other afterward. As we understand the law it is not the location of plaintiff at time of injury under the "danger invites rescue" doctrine. Whether the conduct of plaintiff was a normal response to the stimulus of a dangerous situation created by the fault of the defendant in violating the Safety Appliance Act was a question for the jury. See also Anderson v. Baltimore & O. R. Co., 2 Cir., 1937, 89 F.2d 629, and Erie R. Co. v. Caldwell, 6 Cir., 264 F. 947.
We have neither overlooked nor ignored decisions which would seem to support defendant's position, such as Reetz v. Chicago & E. R. Co., 6 Cir., 46 F.2d 50. The same Court wrote the opinion in the Reetz as the Brown case. The Reetz case is referred to in the Brown opinion with the observation:
"We rejected in the Reetz case the test of duty as a criterion of liability * * *."
We have examined many cases which follow the line of reasoning of the Reetz case. In many of them the division is narrow whether or not proximate cause is a question for the jury. We think this is a borderline case but considering the movement of the cut of cars had started, due to failure of the coupling to couple automatically on impact (the duty of plaintiff under the circumstances thus presented), and probability the movement if not stopped would cause injury, and faced with this dangerous situation we cannot say as a matter of law that the action of plaintiff, an action he was engaged in at the time of injury, was not a normal response to a dangerous situation even though reasonable men may differ on the subject. There is no evidence plaintiff is not a normal *373 person. Seeing the movement of the cars he sprang into action for one purpose only, to stop the movement and avoid resultant injury to person or property. His motive and action was identical to that of the plaintiff in the Brown case.

Order
Motion of the defendant to set aside verdict and judgment entered thereon and to enter judgment for defendant in conformity with its motion for directed verdict at the close of all the evidence, is overruled, and defendant's motion for a new trial is overruled, subject to remittitur ordered in division II of the foregoing memorandum.
NOTES
[1] We assume that a verdict for a larger sum would have been justified for plaintiff as of 1944, in view of plaintiff's approximately 25% larger earnings and injuries much more aggravated than in the Cunningham case.
[2] See United States Department of Labor, Bureau of Labor Statistics, Monthly Labor Review, June 1948, Vol. 66, No. 6. Using periods 1935-39 as a base representing 100, consumers price index for moderate-income families in large cities, average for all items (food, apparel, rent, house-furnishings): 1944=125.5; 1948, May 15=170.5.