George M. Donnelly, Appellee, v. Pennsylvania Railroad Company, Appellant.

Gen. No. 45,141.

SCHWARTZ, P. J., specially concurring, and FRIEND, J., dissenting.

Opinion filed January 23, 1951. Rehearing denied March 5, 1951. Released for publication March 28, 1951.

THEODORE SCHMIDT, P. J. CRONIN and CHARLES F. WHITE, all of Chicago, for appellant; HERBERT C. DE YOUNG, of Chicago, of counsel.

MARION J. HANNIGAN, of Chicago, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Plaintiff's suit was brought under the Federal Safety Appliance Act to recover damages for personal injuries sustained by him, an employee of the Pennsylvania Railroad Company, a corporation, defendant, in its 59th street freight yard. A jury returned a verdict finding defendant guilty and assessing plaintiff's damages at the sum of $65,000. Defendant appeals from a judgment entered on the verdict.

The major contention of defendant is that "the trial court erred in denying defendant's motion for a di-

rected verdict at the close of all the evidence and its subsequent motion for judgment notwithstanding the verdict. The complaint charges, and the case was tried on the theory of, a violation of the Safety Appliance Act. There has been a complete failure of the necessary proof.''

 ''A motion for directed verdict or for judgment notwithstanding the verdict presents the single question whether there is in the record any evidence which, standing alone and taken with all its intendments most favorable to the party resisting the motion, tends to prove the material elements of his case. *Gorczynski v. Nugent,* 402 Ill. 147; *Weinstein v. Metropolitan Life Ins. Co.,* 389 Ill. 571.'' (*Lindroth v. Walgreen Co.,* 407 Ill. 121, 130.)

Plaintiff testified that he had worked for defendant continuously from October 16, 1940, to the date of the accident; that he worked successively as a brakeman, a yard conductor or yard foreman, and as an assistant yardmaster; that on July 11, 1948, the date of the accident, he was working as a yard foreman or yard conductor at the eastbound classification yard of defendant; that this yard is located at 59th street, about one and one-half blocks east of Western avenue, in Chicago; that the north end of the yard is at 59th street and the south end is approximately at 63rd street; that his duties required a great deal of walking, checking the train, going with the train from one yard to another; that his work entailed a great deal of physical exertion of the arms in applying and releasing the brakes, ascending and descending the cars to apply and release the brakes; that in connection with his work he had occasion to couple and uncouple freight cars; that in connection with the classification of cars there was a great deal of coupling and uncoupling of cars; that on the day of the occurrence he had occasion to switch numerous cars back and forth in the yard, and had coupled and uncoupled cars; that on and prior

to July 11, 1948, he was familiar with the mechanical make-up of coupling devices on railroad cars; that a coupling device on a railroad car is composed of the draw bar itself, which extends underneath the car and is fastened to the framework of the car by cross pins through the framework and through the draw bar; that the operating end of the draw bar consists of a movable side, called the knuckle, and the stationary side called the jaw; that the movable knuckle has an opening motion of approximately 90 degrees; that in its open position the knuckle will point approximately straight ahead of the center line of the cars and in its closed position the knuckle presents a flat surface, leaving a space between the edge of the knuckle and the edge of the jaw sufficient to admit the opposing knuckle; that this locking mechanism is operated or controlled by a device which is called the pin lifter, which extends to the outside of the car, and by the operation of the pin lifter, the lock is so actuated that from a closed position the knuckle is normally forced to an open position; that there was also lateral motion in the draw bar which must be sufficient to allow the cars to "break" around a curve; that this lateral motion is limited by a buffer spring or a snubber spring on the cross pins; that when the draw bar is moved from side to side it comes in contact with and operates against the springs; that the function of these springs is to return the draw bar to its center position when it is moved from side to side; that there is sufficient room left in the opening between the knuckle and the jaw of one coupler to allow the entrance of the opposing knuckle, but if the draw bar on one car is out of position—to one side, the draw bar will pass completely by, or if the two jaws are opposed there will be no coupling effected, because the movable parts of the draw bars are outside of the opening where they would be locked by the locking mechanism; that at the time

561

of his injury he and his crew were engaged in making up an eastbound combined freight train known as 88–82 or a CG8–88; that he was told by Reitz, the assistant yardmaster, to make up this combined train on track 6; that one car was picked up on track 13 and then the crew went in on track 12 and picked up some more, about seven more; that after these cars were coupled plaintiff walked toward the south end of the yard to throw the switch on track 6, so that a waiting road engine could get into the track and pull out the cars; that it was quite dark in the yard and he was carrying a lantern; that after throwing the switch he went to the last car on track 6 and was about to cross over when he noticed the angle cock on the last car on track 6 was open; that an angle cock is the device which operates a valve in the air brake system of a train, and that he closed that angle cock and walked west to the other side of track 6 where he operated the pin lifter on the south end of the south car to open the knuckle on that particular car in order to make it convenient for the road engine to make a connection with the first car of the train; that he then proceeded north between tracks 6 and 7 and was then examining the coupling of the cars to make certain that they were coupled; that the coupling between the southernmost car and the one immediately north of it was apparently made and he then proceeded to the next car when he noticed that the coupling was not made; that the north draw bar of the second car was in a closed position; that the knuckle had been knocked over to a closed position; that the knuckle on the south end of the north car, the third car, was also in a closed position and to the west of the center line; that the center of the draw bar was to the west of the center line about three or four inches; that when a draw bar is in that position it will not couple automatically by impact because the solid side of the draw bar, the jaw, would strike the

closed face of the knuckle on the south car; that if a coupling device is in proper working order the draw bar centers itself; that he was not provided with any tools of any kind to use in connection with the aligning of draw bars or opening knuckles on couplers; that he looked to the north and saw no moving cars or lights and heard no movement of any kind of cars or engines in the yard; that he then put his foot across the draw bar on the south of the third car, held on to the grab irons and hand holds on the south end of this northern car and the north end of the southern car; that he had one hand on the grab iron of each car; that when he was in that position some part of his body was between the ends of the cars; that there was no mechanical device on that car that would enable him to align the draw bar without getting his body between the ends of the cars; that when draw bars are out of alignment they are put into alignment by the operation of physical strength applied in two ways—that the more common way when a car is standing by itself would be to back up to the draw bar, hook your hands underneath it, lift it, and swing it into position, but in a case like this, where you would have the other car to hold on to, it is much more common to use the force of a leg to shove the draw bar over; that after he took hold of the two grab irons he put his right foot against the draw bar and had his knee in a bent position; that he then straightened out his leg and shoved the draw bar over; that at that moment there was a loud crash and violent movement of the cars and he was knocked to the ground. Plaintiff also testified that the car in question was on a straight track at the time of the accident.

F. P. McKim, special duty yardmaster for defendant, and a witness for defendant, testified that "in coupling up a train, it is necessary that the draw bars be in alignment in order for them to couple. The draw bars will not couple automatically by impact unless

they are in proper alignment. When the draw bar has been put in proper alignment by pushing it, or otherwise, then they will couple automatically by impact. . . . Before a coupling operation can be made, it is necessary to align the draw bars if they are out of line.''

Edward R. Youngman, foreman in charge of inspectors at the yard in question, was a witness for defendant. He testified upon direct examination as follows: ''Q. Now, what is this part here called? . . . A. That is the shank of the coupler, what is commonly called a shank of the coupler or draw bar, in ordinary language. Q. Now this slot, as I call it, that that shank fits in, what is that called? . . . A. That opening is formed by—it is made for the purpose of upholding or holding the coupler in place and also has sufficient room to permit that coupler to go sideways, and also to go a certain degree inward when it contacts another car. Q. How much play or how much space is there on each side of that draw bar for it to go sideways? A. An inch and a half, the total space. In other words, it goes three quarters either way. Q. Three-quarters of an inch? A. Either way.'' This witness further testified that ''a draw bar will not couple automatically with the draw bar on a car in front of it unless they are in a proper alignment.''

██ We hold that there is in the record evidence which, standing alone and taken with all its intendments most favorable to the plaintiff, tends to prove the material elements in the case.

In *Atlantic City R. R. Co. v. Parker*, 242 U. S. 56, an engine had backed for the purpose of coupling with a car and had failed to couple automatically by impact and thereupon the plaintiff in that case, noticing that the drawhead was not in line with the one on the engine, put in his arm for the purpose of straightening it, thus making the coupling possible, and was caught.

The court, speaking through JUSTICE HOLMES, stated (p. 59):

"If there was evidence that the railroad *failed to furnish such 'couplers coupling automatically by impact' as the statute requires (Johnson v. Southern Pacific Co., 196 U. S. 1, 18, 19), nothing else needs to be considered.* We are of opinion that there was enough evidence to go to the jury upon that point. No doubt there are arguments that the jury should have decided the other way. Some lateral play must be allowed to drawheads, and further, the car was on a curve, which of course would tend to throw the coupler out of line. But the jury were warranted in finding that the curve was so slight as not to affect the case and in regarding the track as for this purpose a straight line. If couplers failed to couple automatically upon a straight track it at least may be said that a jury would be warranted in finding that a lateral play so great as to prevent coupling was not needed, and that, in the absence of any explanation believed by them, the failure indicated that the railroad had not fully complied with the law. *Chicago, Burlington & Quincy Ry. Co. v. United States,* 220 U. S. 559, 571. *Chicago, Rock Island & Pacific Ry. Co. v. Brown,* 229 U. S. 317, 320, 321. *San Antonio & Aransas Pass Ry. Co. v. Wagner,* 241 U. S. 476, 484." (Italics ours.)

The Supreme court affirmed the judgment in favor of the plaintiff. We think the foregoing case has an important bearing upon the instant contention. It will be noted that in the instant case the car was on a straight track. Defendant contends that the *Atlantic City R. R. Co.* case is not applicable to the instant one because here plaintiff made no attempt to first couple automatically by impact. The evidence of plaintiff tends strongly to show that the car in question had failed to couple upon impact before plaintiff discovered that the draw bar was not in alignment. It

565

must also be remembered that it appears from the testimony of plaintiff that the draw bar in question was three or four inches out of alignment and that plaintiff knew that in that position the cars *could not* automatically couple. It would, therefore, have been a useless act for plaintiff to have made a trial to see if the cars would couple automatically by impact. Plaintiff, therefore, *in the line of his duty,* changed by physical force the condition he found, so that the cars would couple automatically on impact. The condition plaintiff found was a violation of the Safety Appliance Act and was the proximate cause of his injuries. At the instance of defendant the court gave to the jury the following instruction: "D20. . . . Before the plaintiff can recover against said defendant, he must prove by a preponderance or greater weight of the evidence that while the plaintiff was engaged in the act of adjusting a drawbar on the third car from the southerly end on track six in the 59th Street Yard, that *The Pennsylvania Railroad Company negligently violated the Safety Appliance Act by permitting a car to be used on its line that would not couple automatically by impact* and that such negligent violation, if any, contributed in whole or in part to injure the plaintiff. . . ." Thus there was submitted to the jury at defendant's own instance the issue as to whether the car in question was one which would couple automatically by impact, and the jury decided against defendant, no doubt basing their verdict upon that testimony of plaintiff which we have heretofore set forth. Defendant, by this instruction, conceded that it would be a violation of the Safety Appliance Act for it *to permit a car to be used on its line that would not couple automatically by impact.*

In the recent case of *Affolder v. N. Y., C. & St. L. R. Co.,* 339 U. S. 96, the New York, Chicago & St. Louis

Railroad Company was the sole defendant. The court states (pp. 97, 98, 99, 100):

"We have for review a judgment of the Court of Appeals for the Eighth Circuit, reversing petitioner's recovery of an $80,000 judgment against the respondent railroad based on an alleged violation of the Federal Safety Appliance Act and the Federal Employers' Liability Act. Petitioner was a member of a crew engaged in classifying, or sorting, a number of railroad cars in the respondent's yards. Twenty-four cars had been coupled together on one track. The twenty-fifth, a Rock Island car, was kicked eastward down the track to couple with the others. It did so, its east end joining the other cars. A Pennsylvania car was the next car kicked eastward down the track, but it and the Rock Island car failed to couple together. After three or four other cars had been added, the Rock Island car and the twenty-four others to which it was attached began rolling down the track. Petitioner ran after the moving train of cars in an attempt to board and stop them, as was his duty. His leg was lost as he fell under a car in this attempt.

"The trial was to a jury, petitioner contending that the failure of the Pennsylvania car to join the Rock Island car on impact was in itself a violation of the Safety Appliance Act, resulting in the separation and his injury. *Respondent took the position that the criterion of the Act is, 'were they [the cars] equipped with efficient couplers?' and not 'did they [the couplers] in fact fail to couple?';* and that if there was a violation of the Act, it was not the proximate cause of the injury. The jury returned a verdict for $95,000 which, upon remittitur, was reduced to $80,000. A judgment in this amount was entered. 79 F. Supp. 365 (1948). On appeal the judgment was reversed. 174 F. 2d 486 (1949). We granted certiorari. 338 U. S. 813 (1949).

"The Court of Appeals determined the issue of proximate cause favorably to petitioner, and respondent admits that the 'problem of causal connection *vel non* in the Affolder case is legally identical with the same problem in the Carter case. [*Carter v. Atlanta & Saint Andrews Bay R. Co.*, 338 U. S. 430 (1949).] We agree and consequently hold the issue correctly determined below.

"*Nor do we think that any question regarding the normal efficiency of the couplers is involved in an action under the Safety Appliance Acts. As we said in O'Donnell v. Elgin, Joliet & Eastern R. Co.*, 338 U. S. 384 (1949), *and the Carter case, supra, the duty under the Acts is not based on the negligence of the carrier but is an absolute one requiring performance 'on the occasion in question.'*

"The Court of Appeals based its disposition of the case on the reasoning that the charge given the jury contained 'no explanation of the legal effect' of the direct proof of the separation of the cars 'and the permissible use which the jury could make of it . . . .' We think the Court of Appeals erroneously concluded that the jury could find for the plaintiff only if it inferred 'bad condition of the couplers and consequent violation of defendant's statutory duty . . . .' This was the same error the Court of Appeals for the Seventh Circuit made in *O'Donnell, supra,* in an opinion relied upon by respondent in the present cause. In subsequently reversing the judgment of the Court of Appeals, *we held that the plaintiff did not have to show a 'bad' condition of the coupler; she was entitled to a peremptory instruction that to equip a car with a coupler which failed to perform properly 'in the switching operation was a violation of the Act,* which rendered defendant liable for injuries proximately resulting therefrom, and that neither evidence of negligence nor of diligence and care was to be considered

568

on the question of this liability.' Further, we said, 'a failure of equipment to perform as required by the Safety Appliance Act is in itself an actionable wrong . . . .'

"Of course this assumes that the coupler was placed in a position to operate on impact. Thus, if 'the failure of these two cars to couple on impact was because the coupler on the Pennsylvania car had not been properly opened,' the railroad [N. Y., C. & St. L. R. Co.] had a good defense. The Court of Appeals also found fault with the charge on the ground that it deprived defendant of this defense. We cannot agree. The trial court directed the jury at least three times that it was for them to determine the reason why the cars separated and specifically called their attention to the testimony of the head switchman, thus emphasizing the possibility that his failure, if any, to open the coupler was the cause of the separation. Likewise, the argument of counsel, both for plaintiff and defendant, clearly reveals that the sole question with regard to this issue was whether, after the couplers were placed in open or proper position, they failed to couple automatically on impact. The jury, by its verdict, resolved the question against the respondent.

"We think the charge, taken as a whole, sufficiently informed the jury of the relevant legal rules.

"We agree with the Court of Appeals that the amount of damages awarded by the District Court's judgment is not monstrous in the circumstances of this case. *Barry v. Edmunds*, 116 U. S. 550 (1886). Accordingly, the judgment of the Court of Appeals is reversed and that of the District Court affirmed." (Italics ours.)

Defendant seeks to evade the effect of this important decision by an interpretation of the following language in the opinion: "Of course this assumes that the coupler was placed in a position to operate on

569

impact. Thus, if 'the failure of these two cars to couple on impact was because the coupler on the Pennsylvania car had not been properly opened,' the railroad [N. Y., C. & St. L. R. Co.] had a good defense." They contend that this proviso qualifies any ruling that the court had theretofore made in its opinion. We cannot agree with this contention. In order to have a better understanding of the facts, we read the opinion of the Circuit Court of Appeals in the same case (*New York, C. & St. L. R. Co. v. Affolder,* 174 F. 2d 486, 488). It there appears that the New York, Chicago & St. Louis Railroad Company, the only defendant in that case, made the point that the cars were properly equipped with proper automatic couplers and "that the failure of these two cars to couple on impact was because the coupler on the Pennsylvania car [the Pennsylvania Company was not a defendant in the case] had not been properly opened." The Circuit Court of Appeals sustained the contention of the Railroad Company that the charge to the jury was not sufficiently clear and definite as to that defense and for that reason remanded the cause for a new trial. The United States Supreme Court disagreed with this ruling and held that the charge on the point in question was fair and full and that the jury by its verdict resolved the question against the Railroad Company, and the judgment of the Circuit Court of Appeals was reversed and the judgment of the District Court in favor of the plaintiff was affirmed. *As to the effect of the so-called "proviso" upon the instant case, it is sufficient to say that no such defense as was interposed in the Affolder case was interposed or advanced in any way by defendant.* Defendant stated its defense in defendant's instruction D20, heretofore quoted in this opinion. We hold that the instant contention is without merit.

570

■ We find no merit in defendant's contention that "Donnelly's negligence was the sole proximate cause of his injuries."

■ Defendant contends that "the manifest weight of the evidence shows that the accident did not occur in the manner claimed by Donnelly." The court instructed the jury, at the instance of defendant, that if the accident did not happen in the manner testified to by plaintiff that he cannot recover. It is clear that the jury found that the accident did occur in the manner shown by the testimony of plaintiff, and after a careful consideration of all the facts and circumstances bearing upon the instant contention, including the alleged impeachment of plaintiff, we are satisfied that we would not be justified in disturbing the jury's finding.

■ Defendant contends that the trial court erred in excluding the safety rules of defendant. In *Howard v. Baltimore & O. C. Terminal R. Co.*, 327 Ill. App. 83 (Leave to Appeal Denied by Ill. Supr. Ct., 391 Ill. 629; Certiorari Denied by U. S. Supreme Court, 328 U. S. 867), a like contention was raised by the defendant, and we held that the contention was not a meritorious one. We adhere to our ruling in that case.

■ Defendant contends that the trial court erred in permitting plaintiff to answer the question: "And a coupling device, when in proper working order, does the drawbar center itself?" Defendant contends that "this question called for a conclusion on the part of the witness and it was improper." The evidence shows that plaintiff was a railroad man of long experience and was familiar with the operation of coupling devices. The question called for the expert opinion of the witness, not for a conclusion, and it was a proper question. In *Williamson v. St. Louis-S. F. Ry. Co.*, 335 Mo. 917, 923, the court held, as to a question akin to the

one before us, that the testimony was not the conclusion of the witness, that the question was a matter for expert evidence and it was proper to permit the witness to answer.

Defendant contends that the trial court erred in allowing an amendment of the complaint after all the evidence had been offered and each party had rested its case. This amendment was made to conform with the evidence and changed the word "knuckle" to "draw bar" in paragraph four of the complaint. Defendant argues that if it had been aware that this was the claim of plaintiff it could have produced additional evidence showing the customary extent of side play in a draw bar and how easy it is for a draw bar to be off center without being defective. However, defendant was aware of the fact that this was the claim of plaintiff from the time plaintiff himself first gave his testimony. It made no point on the need for additional time on account of surprise either at the time the evidence was offered or at the time the amendment was allowed. Moreover, defendant filed a written motion for a new trial and in that motion no point was made that the trial court erred in permitting the amendment to the complaint. In *People v. Cohen,* 352 Ill. 380, 382, the court states:

" . . . If certain points in writing particularly specifying the grounds of a motion for a new trial have been filed, the party filing the same will be deemed to have waived all causes for a new trial not set forth in his written grounds and in the Appellate Court will be confined to the reasons specified. If the motion has been submitted without specifying the grounds therefor in writing, the party may avail himself of any cause for a new trial which may appear in the record, whether it be the admission or rejection of evidence, the giving or refusing of instructions, the lack of sufficient evidence, or any other error occurring on

the trial. The above holding by this court is applicable to both civil and criminal cases. (*Yarber v. Chicago and Alton Railway Co.,* 235 Ill. 589; *Anderson v. Karstens,* 297 id. 76; *Bromley v. People,* 150 id. 297.) The foregoing rules applied to motions for new trial are also applied by this court to motions in arrest of judgment, and when a motion in arrest of judgment does not specify the grounds therefor, it will be presumed, on appeal, that every proper ground for arrest of judgment was presented to the court. *People v. Goldberg,* 287 Ill. 238.''

 Defendant contends that the trial court erred in giving to the jury at the request of plaintiff instructions P2 and P6. Both of these instructions relate to the question of damages and as defendant does not contend that the damages awarded by the jury are excessive it is difficult to see how defendant could have been injured by the giving of the said instructions.

Defendant contends that the court erred in giving, at the instance of plaintiff, instruction P4. We have carefully considered the argument made in support of the instant contention and find that it is devoid of real merit.

Defendant contends that the court erred in giving plaintiff's instruction number 5, which reads as follows:

''It is alleged in plaintiff's complaint that on the 11th day of July, 1948 plaintiff was in the employ of the defendant as a railroad yard foreman and was working for the defendant in its yards in the vicinity of 63rd Street in the City of Chicago and State of Illinois.

''It is further alleged that the defendant was operating a railroad as a common carrier and that both the plaintiff and the defendant were engaged in work which substantially affected Interstate Commerce.

"It is further alleged that on the aforesaid date and while plaintiff was engaged in the act of attempting to couple cars located on track Number 6 in the aforesaid railroad yard the defendant, its agent, servant and employee, caused said cars to be run into resulting in plaintiff sustaining serious and permanent injuries.

"It is further alleged that the defendant in violation of the law of the United States used or permitted to be used on its line a car which would not couple automatically by impact without the necessity of a man going between said cars.

"It is further alleged that as a direct and proximate result of the aforesaid violation of law, if any, plaintiff sustained serious and permanent injuries.

"If you believe from a preponderance of the evidence under the instructions of the court that the plaintiff has proved the allegations of his complaint as above set forth and that the defendant was guilty of the particular violation as above set forth and as alleged in his complaint and that such violation, if any, was the proximate cause of the injuries complained of in this case then you should find the defendant guilty."

 Defendant's sole criticism of this instruction is that as it summarizes the allegations of the complaint it should have included the allegations of the answer. Instructions which summarize the allegations of the complaint have been sustained by this court. (See *Murphy v. King,* 284 Ill. App. 74, 83, 84 (Leave to Appeal Denied, 284 Ill. App. xvi); *Selman v. Midwest Haulers, Inc.,* 309 Ill. App. 154, 161; *Bobalek v. Atlass,* 315 Ill. App. 514, 529. See, also, *Goldberg v. Capitol Freight Lines,* 382 Ill. 283, 292.) We note that the trial court gave to the jury at the instance of defendant the following instruction: "D8. The defendant, The Pennsylvania Railroad Company, in its an-

swer filed herein, denies that it or any of its agents or employees were guilty of the act of negligence charged against it or of any violation of any law, and further alleges that plaintiff's own negligence was the sole, proximate cause of such injury as he actually sustained." The court also gave at the instance of defendant the following instruction: "D15. The complaint filed by the plaintiff and the answer filed by the defendant in this case are the unsworn statements of what the plaintiff and defendant allege and they neither prove nor tend to prove any allegation contained therein in relation to this case." There is no merit in the instant contentions.

■ Defendant contends that the trial court erred in giving plaintiff's instructions P9 and P6. Defendant's argument is that the evidence does not show any violation of the Safety Appliance Act by Pennsylvania or any failure of any car to couple automatically by impact, and that the two instructions therefore were abstract instructions and prejudicial to defendant. It is sufficient to say in answer to this contention that there was evidence of a violation of the Safety Appliance Act by defendant, and there was evidence to show that the car in question could not couple automatically by impact.

■ The final contention of defendant is that the trial court erred in giving to the jury the following instruction: "P17. The jury are instructed that, while the law permits the plaintiff in the case to testify in his own behalf, the jury have no right to discredit his testimony from caprice, or merely because he is the plaintiff." This instruction has been given in personal injury cases for many years and defendant fails to cite any case in which it has been condemned or criticized. The sole argument of defendant in support of its contention is the following: "It is a matter of conjecture as to whether the jury would know what

575

'caprice' meant. It could well be misleading.'' The argument made requires no answer.

In conclusion, we are impelled to quote from the opinion of the Supreme court in the recent case, *Lindroth v. Walgreen Co.*, 407 Ill. 121, *supra,* where the court states (p. 136): "A judgment will not be reversed for error unless it appears such error affected the outcome below. *Pease v. Kendall,* 391 Ill. 193; *Devine v. Delano,* 272 Ill. 166.''

Defendant has had a fair trial and the judgment of the Circuit court of Cook county should be and it is affirmed.

*Judgment affirmed.*

FRIEND, J., dissents: I know of no case which goes so far as to hold that the Safety Appliance Act is violated by the failure of a railroad company to equip cars with couplers having drawbars which will center themselves under all circumstances without the necessity of being manually placed in position to couple on impact; yet that is precisely the effect of the majority opinion.

Plaintiff alleged that defendant had violated the Safety Appliance Act by failing to equip the cars with "couplers coupling automatically by impact." In order to recover it was incumbent on him to prove that there was a failure to couple because the cars were not so equipped. I find no evidence that the freight cars in question were not equipped with couplers which would couple automatically by impact. There was no showing whatever that they were out of order. The most that plaintiff's evidence established is that they were not at the moment aligned, or in position for coupling. The common practice among railroads is to center the drawbars by manual operation when they are out of alignment, before the coupling operation begins. Plaintiff himself testified (Abstract 18) that "when draw bars are out of alignment, they are

put into alignment by the operation of physical strength. Strength is applied in two ways. The one which is more common on a car which is standing by itself would be to back up to the draw bar, hook your hands underneath it and lift it and swing it into position. But in a case like this, where you would have the other car to hold on to, then it is much more common to use the force of a leg to shove the draw bar over." It was while engaged in this manual operation that plaintiff was injured. It must be presumed, because there is no evidence to the contrary, that if the drawbar had been manually centered, as was admittedly the common practice, the cars would have coupled automatically on impact, as required by the act. It has been held that a violation of the statute is shown by proof that cars *upon a fair trial* failed to couple automatically by impact. *Southern Ry. Co. v. Stewart,* 119 F. 2d 85 (1941). A full discussion of the duties placed on railroads under section 2 of the act is found in *Western & Atlantic R. R. v. Gentle,* 58 Ga. App. 282, 198 S. E. 257 (1938), *certiorari* denied 305 U. S. 654, wherein the court said: "The railroad has complied with the law when it equips its cars with couplers designed to couple automatically upon impact without the necessity of men going between the ends of the cars, which couplers are of general use among well-regulated railroads, and unless the failure of the couplers to couple on a given occasion results from some defect therein, the railroad cannot be held responsible for injuries resulting proximately therefrom. . . . To give the act any other construction would result in absurdities, plainly not within the contemplation of Congress in the passage of this act." The court quoted with approval the following view expressed in *St. Louis Southwestern Ry. Co. of Texas v. Bounds,* Tex. Civ. App., 244 S. W. 1099 (1922): " 'It would be manifestly unfair to hold that the car-

rier had violated the statute until the inefficiency of the device had been disclosed by some reasonable test that would justify the conclusion that it was defective.' " In the case at bar the evidence does not show any failure of the couplers to couple automatically by impact. The coupling operation had not begun and no attempt at coupling had been made. A violation of the statute as charged could be shown only if, with the drawbars in alignment, the cars actually failed to couple on impact without the necessity of someone going between the cars.

The majority opinion relies heavily on *Atlantic City R. R. Co. v. Parker*, 242 U. S. 56. That decision can readily be distinguished from the case at bar because there an attempt had been made to couple a car onto the engine but the coupling *failed* to make. So far from being a ''cow'' case, as is suggested in the specially concurring opinion, it is really a ''horse-of-another-color'' case.

The most recent pronouncement on the subject is to be found in *Affolder v. N. Y., C. & St. L. R. Co.*, 339 U. S. 96 (1950), where there had been a failure to couple on impact in the course of the coupling operation, and the court held that a failure of equipment to perform as required by the Safety Appliance Act was in itself an actionable wrong. This is undoubtedly in harmony with current decisions, but the qualification in the opinion is significant: ''Of course this assumes that the coupler was placed in a position to operate on impact. Thus, if 'the failure of these two cars to couple on impact was because the coupler on the Pennsylvania car had not been properly opened,' *the railroad had a good defense.* . . . Likewise, the argument of counsel, both for plaintiff and defendant, clearly reveals that *the sole question with regard to this issue was whether, after the couplers were placed in open or proper position, they failed to couple auto-*

*matically on impact."* MR. JUSTICE JACKSON, dissenting from the majority opinion, expressed views not at variance with the main opinion as follows: *"Before a failure to couple establishes a defective coupler, it must be found that it was properly set so it could couple. If it was not adjusted as such automatic couplers must be, of course the failure is not that of the device."* (Italics ours.) The marginal notes in the *Affolder* case indicate that there was something wrong with the knuckle. The head switchman had difficulty in opening it. As plaintiff's counsel stated, "he had to push it three times, when it failed to open the first time, showing something was stuck." The case was resolved on the interpretation of the instructions, and the court merely held that under the instructions given, the jury could find a failure of the equipment to perform as required by the act. The language used in both the majority and dissenting opinions in the *Affolder* case is clear and unequivocal. It indicates, it seems to me, as clearly as the English language can, that before a failure to couple establishes a defective coupler, the couplers must be properly set, and it would be an evasion of plain words to construe this as meaning that they must be automatically set by means of springs or devices of any other kind. In fact I find no case which holds or even suggests that the adjustment of the automatic couplers, before contact of two cars is attempted, must be an automatic rather than a manual operation. On the contrary, from the language employed in the most recent decisions, one must assume that the courts had in mind that if the drawbars and knuckles are out of alignment they have to be adjusted manually before coupling is attempted. It is in this respect that I think the majority opinion goes far beyond any of the reported cases, since it holds in effect, although it does not expressly so state, that section 2 of the Safety Appliance Act is violated

if cars are not equipped with couplers having devices which automatically center the drawbar so that no manual operation is required. It is clear from the most recent expressions of the Supreme Court that this is contrary to the accepted practice. The statute has been complied with when the cars are supplied with couplers *which will couple automatically on impact when properly set.* In the case at bar, there was not the *failure* of equipment to perform found in the *Affolder* case.

I am not unmindful of the fact that courts have construed the act liberally so as to permit recovery where legally possible, and this is as it should be. It is indeed difficult to deny recovery to an employee who has been severely injured, but the adage that hard cases sometimes make bad law is, it seems to me, applicable to this situation.

Mr. Presiding Justice Schwartz specially concurring: I desire to make clear the issue which has divided the court.

We are all agreed that the Safety Appliance Act requires a railroad company to equip cars with couplers that will couple automatically on impact without the necessity of men going between the ends of the cars. It is no defense to show that the couplers were in general use and of such design as to couple on impact, nor that in normal operation they would do so. In *Atlantic City R. R. Co. v. Parker,* 242 U. S. 56, an engine had backed for the purpose of coupling with a car and had failed to couple by impact. The plaintiff, noticing that the drawbar was not in line with the one on the engine, put in his arm for the purpose of straightening it and thus making the coupling possible, and was caught. The court held that while some lateral play in the drawbar must be allowed to enable a train to round a curve and while the car in question was on a curve, which would tend to throw the coupler out

of line, nevertheless the question was for the jury. In the instant case, plaintiff saw that the drawbar was out of line three or four inches and therefore would not couple on impact even on a straight track. It could only be put into alignment by his going between the cars and applying manual force to the correction of the situation. The one distinction made by defendant and our dissenting colleague, between the case before us and *Atlantic City R. R. Co. v. Parker, supra,* is that in the instant case it is contended there was no prior attempt to couple. As the opinion of the court shows, there is evidence from which the jury could have inferred otherwise. However, this is a distinction without substance and not founded on any interpretation of the law in letter or spirit. In all other respects, *Atlantic City R. R. Co. v. Parker* is, in the vernacular of our local bar, a "cow" case (on all fours).

I admit that some of the language in the case of *Affolder v. N. Y., C. & St. L. R. Co.,* 339 U. S. 96, can be construed to support the opposing point of view. A careful examination, however, reveals that the *Affolder* case was submitted to the jury very much in the same manner as the instant case, and the court there, as here, sustained the finding of the jury. To understand the true meaning of the *Affolder* decision it is necessary first to consider the nature of the coupling operation. In order that the parts may join, the jaw of at least one of the couplers must be open. Ordinarily and normally, when uncoupled, the jaws would be open, but by reason of some prior violent impact or for some other reason, occasions arise when the jaws of both couplers are closed. In order that they may be opened without the necessity of a man going between the cars a "pin lifter" is provided which extends to the outside of the car and can be operated to force the coupler to an open position. The drawbar, which con-

stitutes the coupling mechanism in its entirety, must be allowed some lateral motion in order to permit the rounding of curves. The normal deviation is 1½ inches on either side and we gather from the evidence that within these limits coupling can be effected. In the *Affolder* case the defense was that couplers had been provided in compliance with the act and that failure to couple was due to the fact that the couplers were not opened. On appeal from the judgment against it, defendant contended that from the instructions of the court the jury were misled into believing that failure to couple on impact required them to find that there was a violation of the Safety Appliance Act. The Court of Appeals upheld the position of defendant. The Supreme Court reversed the Court of Appeals and held that the charge to the jury was not erroneous. In the course of the court's opinion, after holding that failure to provide couplers that will couple automatically on impact is the basis of the action, it was stated: " . . . this assumes that the coupler was placed in a position to operate on impact. . . . if 'the failure of these two cars to couple on impact was because the coupler on the Pennsylvania car had not been properly opened,' the railroad had a good defense." This was largely incidental comment. Moreover, the court was there referring to the opening of the jaws of the coupler and not to the alignment of the drawbar. The opening of the jaws of the coupler could have been accomplished as we have stated without a man going between the cars. As to the drawbar in the instant case, there was no provision for putting that into position without requiring a switchman to go between the cars.

In the opinion of the court, MR. JUSTICE SCANLAN has examined the instructions and one of them, which specifically defines the duty of the defendant, was given at the instance of the defendant. There can be no such complaint with respect thereto as there was in

the *Affolder* case. Our decision is not based on a holding that the defendant is at all times required to equip its cars with couplers having drawbars which will center themselves under all circumstances without manual intervention, as our dissenting colleague assumes. It is based on the fact that the jury was properly instructed and found that at the time and place in question the car in question was not equipped with couplers capable of coupling automatically on impact without the necessity of a man going between the cars, and there is ample evidence in the record to sustain the jury's verdict.